Edward F. OWEN and Dolores Owen, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Herman KNOP and Dorothy Owen Knop, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 60, 61.

United States District Court D. Nebraska.

Sept. 9, 1955.

Swarr, May, Royce, Smith & Story, Edson Smith, Omaha, Neb., for plaintiffs.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Robert B. Ross, Attys., Dept. of Justice, Washington, D. C., and Donald R. Ross, U. S. Atty., and William C. Spire, Asst. U. S. Atty., Omaha, Neb., for defendant.

DONOHOE, Chief Judge.

These actions were instituted by plaintiffs against the United States to recover certain taxes alleged to have been illegally assessed and collected. This court has jurisdiction, 28 U.S.C. (1952 Ed.) 1340, 1346; venue is properly laid in what was formerly the Omaha Division of this District, 28 U.S.C. (1952 Ed.) 1402(a); and all the required conditions precedent to institution of this action have been fulfilled, I.R.C.1954, § 7422(a), 26 U.S. C.A. The case was tried to the court, without a jury, and in keeping with Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A., the court makes the following special

### Findings of Fact.

In 1948, Fred E. Owen, president and principal stockholder of Paxton & Vierling Iron Works, in Omaha, Nebraska, became desirous of turning over the active management of this company to his son Edward Owen who was also an employe and stockholder. Edward, who then owned 205 of 1,752 shares of Paxton & Vierling stock outstanding was interested in acquiring more stock since he was in the process of assuming more responsibility for the management of the corporation. At this time Edward Owen's sister, Dorothy Owen Knop, owned 145 shares of the corporation's stock; and Edward talked to his father, who was Dorothy's business adviser in all transactions material to this law suit, about purchasing the stock.

Fred Owen was apprehensive that a conflict might arise between his son and daughter of the sort he had seen between brother and sister stockholders before, where the brother actively managed the corporation and drew a salary while the sister received no dividends because the corporation failed to show a profit. Consequently, he thought it best that Dorothy sell her interest in Paxton & Vierling

and invest her money in something else. Since Fred Owen was scheduled to undergo a very serious operation at the Mayo Clinic in November, 1948, he was anxious to settle the stock problem before that time. Consequently he suggested to Dorothy that she sell the stock to Edward at $300 a share. Both Edward and Dorothy were willing to effect a sale at that price but Edward wanted some time to decide how he would ultimately raise $43,500 to pay for the stock. He had stock, securities and real estate which he could mortgage or sell and he wanted until some time after the first of the year to decide which he would do. Under these circumstances Dorothy Knop and Edward Owen executed the following agreement:

"Agreement

"This agreement entered into this 15th day of October, 1948, between Dorothy O. Knop, first party, and Edward F. Owen, second party, Witnesseth:

"First party agrees to sell and second party agrees to buy from first party 145 shares of the capital stock of Paxton & Vierling Iron Works now owned by first party, ex dividends for the current year, for a total consideration of Forty-three Thousand Five Hundred Dollars ($43,500.00) payable March 1, 1949, with interest at five per cent from date hereof until due and 10 per cent thereafter until paid, said obligation of second party to be evidenced by his negotiable promissory note secured by a deposit of all of said stock as collateral security thereto.

"In Witness Whereof, the parties hereto have executed this agreement on the date aforesaid.

"Witness:

| "(s)  Dorothy Zigger | (s)  Dorothy O. Knop |
|---|---|
| | "First Party |
| "(s)  Harry E. Judd | (s)  Edward F. Owen |
| | "Second Party" |

Pursuant to the foregoing agreement, Edward Owen executed and delivered to Dorothy Knop the following note:

"Note

"$43,500.00                                    October 15, 1948

"On March 1, 1949, for value received, I promise to pay to Dorothy O. Knop or order, at 705 Keeline Building, Omaha, Nebraska, Forty-three Thousand Five Hundred Dollars ($43,500.00) with interest at five percent per annum until maturity and ten per cent per annum thereafter until paid.

"This note is secured by 145 shares of the capital stock of Paxton & Vierling Iron Works, certificate 167."

The 145 shares of stock owned by Dorothy Knop were transferred on the books of the corporation to Edward Owen and a new certificate for 145 shares was issued to him, and he gave possession of this certificate to Dorothy to hold as collateral security for his note. There was no agreement between Edward and Dorothy at, or before, the time the note was given relating to how it would be paid because Edward had not yet decided this. However, he was at all times solvent and the note, when given, had a fair market value equal to its face value. The court finds that Dorothy Knop's sale of the 145 shares of Paxton & Vierling

stock to Edward Owen was a single, complete and bona fide transaction in every respect.

The historical background of the 145 shares of stock which Dorothy O. Knop sold to Edward F. Owen on October 15, 1948, is as follows:

In 1937, Fred Owen purchased 422½ shares of Paxton & Vierling stock for $62.50. In 1943, he purchased 302½ more shares for $127.766 a share with money which he borrowed from his wife, Lizette C. Owen. On August 31, 1943, Paxton & Vierling stock certificate No. 139 was issued to Fred E. Owen for the 725 shares of stock just referred to. On January 20, 1944, certificate No. 139 was cancelled and two new certificates were issued: No. 145 to Lizette C. Owen for 302½ shares, and No. 146 to Fred E. Owen for 422½ shares. Fred E. Owen had the 302½ shares issued to his wife to repay the loan. The fair market value of this stock at the time certificate No. 145 was issued was substantially $127.766 per share. Out of the 302½ shares of stock represented by certificate No. 145, Lizette C. Owen made the following gifts to Dorothy Owen Knop:

| | | |
|---|---|---|
| October 4, 1945 | 25 shares | Certificate No. 153 |
| February 18, 1946 | 20 shares | Certificate No. 159 |
| February 5, 1947 | 34 shares | Certificate No. 161 |

Out of the 422½ shares represented by certificate No. 146, Fred E. Owen made a gift of 20 shares, represented by certificate No. 156 to Dorothy Owen Knop.

On August 31, 1943, certificate No. 132 for 300 shares of Paxton & Vierling stock was issued to A. J. Vierling, Trustee. Of this 300 shares, 75 shares had been purchased on August 31, 1943, from Molthop at $127.766 per share. Owen sold the 300 shares to A. J. Vierling, Trustee. The sale was made pursuant to a written agreement whereby the A. J. Vierling family accepted these 300 shares as payment of an outstanding note in the sum of $30,000 jointly executed by Fred Owen and D. T. Molthop. The A. J. Vierling family then sold the 300 shares to the Paxton & Vierling Iron Works and this company gave notes in the sum of $30,000 as payment. On August 31, 1943, certificate No. 132 was cancelled and certificates Nos. 133, 134, 135, 136, 137 and 138, each in the amount of 50 shares were issued in the name of Paxton & Vierling Iron Works—Treasury Stock. On October 4, 1945, in keeping with the beforementioned agreement, upon Fred E. Owen's payment of the notes which Paxton & Vierling Iron Works had executed to A. J. Vierling, Trustee, certificates Nos. 133 through 138, inclusive, were cancelled and the following certificates were issued to the persons indicated:

| | | |
|---|---|---|
| Certificate No. 149 | 25 shares | Dorothy O. Knop |
| Certificate No. 150 | 25 shares | Edward F. Owen |
| Certificate No. 151 | 250 shares | Fred E. Owen |

Certificate No. 149 represented a gift of 25 shares of Paxton & Vierling Iron Works stock to Dorothy O. Knop. Out of the 250 shares represented by certificate No. 151, Fred E. Owen made a gift of 21 shares, represented by certificate No. 163, to Dorothy Owen Knop on February 5, 1947.

On October 15, 1948, the Paxton & Vierling Iron Works stock had a fair market value of $300.00 per share.[1] It

---

1. Plaintiffs' witness Buffet estimated the fair market value at $193.18 per share, while plaintiffs' witness Flodeen estimated the value at $220 per share. The court is inclined to accept this testimony as indicative of the fact that the stock was not worth more than $300 a share, which was the sale price agreed upon by Edward Owen and Dorothy Knop. Since the court has found that the sale

had substantially the same fair market value on February 15, 1949.

On January 17, 1949, Dorothy Knop and her husband, Herman Knop, filed a joint federal income tax return for the calendar year 1948. Among other things the return disclosed:

| | |
|---|---|
| Income (excluding capital gains and losses) | $22,023.11 |
| Net Long Term Capital Gain | 48,092.85 |
| Net Long Term Capital Loss | 1,519.00 |
| Adjusted Gross Income | 44,550.54 |
| Taxable Net Income | 40,427.88 |
| Tax | 12,948.46 |

The return also disclosed the following information in regard to the sale of the 145 shares of Paxton & Vierling stock:

| Purchased | Sold | Cost | Sale Price | Gain |
|---|---|---|---|---|
| 1945-6-7 | 10-19-48 | $18,526.07 | $43,500.00 | $24,973.93 |

By January 17, 1949, the Knops had paid the entire tax due, as shown on their 1948 return.

Neither in the 1948 return, nor in any subsequent return did Dorothy Knop and her husband report the interest income from Edward Owen's note.

During the last months of 1948, and early months of 1949, Edward Owen gave considerable thought to the manner in which he would satisfy the note held by his sister Dorothy Owen Knop. He was reluctant to sell anything and consequently thought seriously of borrowing the money and putting up some of his property as collateral.

About February 1, 1949, Fred Owen returned from the Mayo Clinic and had some discussions with his son about taking care of the note. Fred did not want his son to get too heavily in debt and suggested that he consider selling his undivided interest in certain farm lands to Dorothy. Edward asked Fred to find out what Dorothy would give for his interest in the farm lands; and after talking to Dorothy, Fred advised Edward that she would bid $44,225, the exact amount due on Edward's note, including principal and interest to February 15, 1949. Edward agreed to sell and the following contract was executed by the parties:

"Agreement

"This agreement entered into this first day of February, 1949, by and between Dorothy O. Knop, first party, and Edward F. Owen, second party, Witnesseth:

"Whereas, the parties hereto as tenants in common are each the owners of an undivided one-half interest in the following described real estate, to-wit:

"The West Half of the East Half and the East Half of the West Half of Section 15; also

"The Southeast Quarter and the Northeast Quarter of the Southwest Quarter of Section 14; also

"The West Half of the Northeast Quarter of Section 13; all in Township 93, Range 30, West of the 5th P.M., Humboldt County, Iowa.

was in all respects bona fide the court is constrained to find that the sale price fairly reflects market value of the stock on the date of sale. The testimony of Revenue Agent, Lawrence W. Louck, relating to the fair market value of the stock is hereby rejected.

"Now Therefore, for the mutual consideration herein contained, it is agreed as follows:

"Second party agrees to sell and first party agrees to buy from second party all of second party's undivided one-half interest in the above described real estate for a consideration of Forty-four Thousand Two Hundred Twenty-five Dollars ($44,225.00) in cash, transfer of title to be by warranty deed delivered February 15, 1959.

"In Witness Whereof, the parties hereto have executed this agreement on the date aforesaid.

"Witness:

| | |
|---|---|
| "(s) Dorothy Zigger | (s) Dorothy O. Knop |
| | "First Party |
| "(s) Harry E. Judd | (s) Edward F. Owen |
| | "Second Party |
| "(s) Dorothy Zigger | (s) Dolores C. Owen |
| | "Wife of Second Party" |

Pursuant to this contract Edward executed a warranty deed to the described premises and Dorothy returned his note to him as payment of the contract price on February 15, 1949. The parties have agreed by written stipulation duly filed that the fair market value of the undivided interests in the farm lands which Edward conveyed to Dorothy pursuant to the contract was $67,500 on February 15, 1949, and that Edward's net cost, after depreciation to February 15, 1949, for this property was $52,457.20. The fair market value of Edward's note on February 15, 1949, was $44,225. The exchange of the farm land for the note on February 15, 1949, was a bona fide transaction and it was separate and distinct from the sale of the 145 shares of stock on October 15, 1948.

On January 17, 1949, Edward F. Owen and his wife, Dolores Owen, filed a joint federal income tax return for the calendar year 1948. Among other things this return disclosed:

| | |
|---|---|
| Income (excluding capital gains and losses) | $25,319.41 |
| Net Long Term Capital Gain | 19,246.76 |
| Net Short Term Capital Loss | 1,000.08 |
| Adjusted Gross Income | 33,942.71 |
| Taxable Net Income | 30,542.71 |
| Tax | 8,509.26 |

By January 17, 1949, Edward and Dolores Owen had paid the entire tax due as shown on their 1948 return.

Edward and Dolores Owen did not file an estimate of their income tax for the calendar year 1950. However, before January 15, 1951, they filed a joint income tax return for the calendar year 1950 and paid the entire tax shown to be due.

On January 23, 1950, Dorothy Knop and her husband, Herman Knop, filed a joint federal income tax return for the calendar year 1949. Among other things this return disclosed:

| | |
|---|---|
| Income (excluding capital gains and losses) | $14,217.79 |
| Net Long Term Capital Loss | 1,337.05 |
| Net Short Term Capital Loss | 1,027.99 |
| Adjusted Gross Income | 13,217.79 |
| Taxable Net Income | 8,986.68 |
| Tax | 1,664.16 |

On October 23, 1952, the Director (formerly Collector) of Internal Revenue at Omaha, Nebraska, levied a deficiency assessment against Dorothy and Herman Knop for the calendar year 1948 in the principal sum of $9,799.44 plus interest of $2,098.15. The deficiency assessment was anticipatorily paid on October 13, 1952; and a claim for its refund, filed January 2, 1953, was denied by the Commissioner of Internal Revenue April 15, 1953.

On October 23, 1952, the Director of Internal Revenue at Omaha, Nebraska, levied a deficiency assessment against Edward and Dolores Owen for the calendar year 1948 in the principal sum of $9,177.34 plus accrued interest of $1,964.95. This deficiency assessment was anticipatorily paid on October 13, 1952; and a claim for refund, filed January 2, 1953, was denied by the Commissioner of Internal Revenue April 15, 1953.

On October 23, 1952, the Director of Internal Revenue at Omaha, Nebraska, levied a penalty assessment against Edward and Dolores Owen for the calendar year 1950 in the sum of $584.10, for failing to file an estimate of, and also for underestimating, their 1950 income tax. This penalty was paid on October 13, 1952, and a claim for refund of $267.96, that portion of the penalty relating to the Owen's underestimation of their tax, was filed January 2, 1953. This claim for refund was denied by the Commissioner of Internal Revenue on April 15, 1953.

### Discussion.

Simply stated this case involves two separate and distinct taxable transactions: one occurring in 1948 and the other in 1949. The tax consequences of these transactions will be discussed in the order in which they occurred.

■ The gain derived by Dorothy Owen Knop in 1949 when she exchanged 145 shares of Paxton & Vierling stock for her brother's note is the difference between her adjusted basis for the stock and the amount realized upon the exchange. 26 U.S.C. (1952 Ed.) § 111(a). Since she acquired the stock by gift, her adjusted basis for it is the same as it would have been in the hands of the donors. 26 U.S.C. (1952 Ed.) § 113 (a) (2). Seventy-nine of these shares were given to her by Lizette Owen who acquired them in a group of 302.5 shares[2] for which she cancelled a debt in the sum of $38,649.22. Since the debtor was solvent the debt had a fair market value equal to its face value and Lizette Owen's basis for the stock became $127.-766 per share. 26 U.S.C. (1952 Ed.) § 113(a) (1). Cf. Thomas Watson, 8 T.C. 569; Victory Glass, Inc., 17 T.C. 381.

■ Dorothy received 20 of the 145 shares by gift from her father on February 18, 1946. At this time he had shares which he had purchased in 1937 for $62.50 a share and shares which he had purchased in 1945 for $127.766 a share. Since the 20 shares given were not identified with regard to the block from which they were taken, the court, applying the first in, first out rule, must assume that these 20 shares had a basis of $62.50 in the hands of Fred Owen. Treas.Reg. 29.22(a)–8.

■ Dorothy received 21 of the 145 shares of stock by gift from her father on February 5, 1947. These shares had been purchased by him for $100 a share on October 4, 1943, pursuant to a repurchase agreement, which was an integral part of a wash sale. See Owen v. United States, D.C.Neb.1951, 99 F.Supp. 855, 859. Since a loss of $27.766 per share was disallowed in connection with the wash sale, this amount must be added to the cost of the stock repurchased to adequately reflect its basis. 26 U.S.C. (1952 Ed.) §§ 113(a) (10) and 118. Consequently the basis of this stock in Fred Owen's hands was $127.766 per share.

---

2. When Lizette Owen acquired this stock, its fair market value was substantially $127,766 per share, the amount for which it had been purchased just a few months earlier.

**38**

■ From what has been said it appears that Dorothy Owen's basis for the 145 shares of stock was $17,220.75. The amount realized upon their sale to her brother was $43,500, the fair market value of the note received. A. & A. Tool & Supply Co. v. Commissioner of Internal Revenue, 10 Cir., 1950, 182 F.2d 300. Her recognized gain was $26,279.25. She and her husband, having reported a gain of only $24,973.93, understated their income by $1,305.32. However this does not approach 25% of the gross income shown by their return; consequently the applicable statute of limitation had run long prior to the deficiency assessment of October 23, 1952. 26 U.S.C. (1952 Ed.) § 275(a).

■ A second taxable transaction occurred when Dorothy traded Edward the note for the farm lands in February of 1949. See Oscar T. Crosby, 27 B.T.A. 1234, in which the petitioner received a deed to a house and lot in Florida in 1928 in satisfaction of a note for $1,000. He sold the house and lot in 1929 for $169.27 net after commissions and expenses and claimed an $800 loss, which the Commissioner disallowed. In regard to this transaction the Board of Tax Appeals held:

"When petitioner took a deed to the Florida real estate in 1928 in satisfaction of a note, he realized a gain or sustained a loss at that time, dependent on the then value of the real estate. The respondent disallowed the loss in 1929 on the ground that the property was worth no more in 1928, when acquired, than in 1929 when sold. The 1929 sale established the value in that year and this, under the respondent's finding, may be taken as the value in 1928. Accordingly, the petitioner is entitled to a loss deduction for 1928 of the difference between the amount of the note, $1,000, and the amount of $169.27."

For the reasons stated in the Crosby case, the court is inclined to the view that Dorothy Knop recognized a gain in this case when she exchanged the note for the farm lands in 1949. The court acknowledges, that it is unusual, almost unbelievable, that any one would, *bona fide*, give farm lands worth $67,500 to satisfy a note in the amount of $44,225.00.[3] But the parties have stipulated the value of the farm lands and plaintiffs assert, to their detriment in a sense, that this was a bona fide transaction. Consequently the court is constrained to find that Dorothy Knop recognized a $23,275 gain. Since the transaction was not a "sale" or "exchange" within the meaning of Section 117 of the Internal Revenue Code, the gain is taxable as ordinary income. Lee v. Commissioner, 7 Cir., 1941, 119 F.2d 946. But even if the transaction were considered as an "exchange" the gain would be taxed as ordinary income since the note was not held for more than six months. 26 U.S.C. (1952 Ed.) 117(a). Dorothy Knop also recognized $725 in interest income on the note by reason of the exchange. Neither the gain, nor the interest income, were reported in the 1949 return, which she filed jointly, with her husband: Thus, their joint income was understated by $24,000. This is substantially more than 25% of the gross income stated in their 1950 return; and the five-year statute of limitations, 26 U.S.C. (1952 Ed.) § 275(c) had not run when the Government filed the amendment to its pleadings raising the issue just discussed. Under these circumstances, the Government's right to set off the tax due for 1949, against Dorothy and Herman Knop's claim for refund of the deficiency paid for 1948 is not precluded by the statute of limitations. See 54 C.J.S., Limitations of Actions, § 285, p. 342 et seq.

■ Edward Owen and his wife are entitled to a refund of the entire amount sued for. The Commissioner's deficiency assessment against them for the year 1948 was based upon the assumption that Edward Owen recognized a gain on the transactions with his sister. The evidence does not bear this out. Wheth-

3. This included principal and interest.

er the stock-note-farm transactions are treated separately or as a unit, Edward Owen recognized a loss because his basis for the farm was $52,457.20 which is more than the value of either the stock or the note.

As to the $267.96 penalty for underestimating their income, the court agrees with Judge Sloan:

"The addition of 10% of the tax for failure to file the declaration or pay the installment of the estimated tax is proper to be added in the applicable years. However, the addition of 6% for substantial underestimate of estimated tax is improper for the very obvious reason that the tax was not underestimated, indeed, the taxpayer filed no declaration of estimated tax at all and suffers the greater sanction of 10% addition to the tax for the failure, and the failure to pay the tax." United States v. Ridley, D.C. N.D.Ga., 1954, 120 F.Supp. 530, at page 538.

The $267.96 penalty of 6%, having been erroneously assessed, must be refunded.

Counsel for the Government shall prepare and submit for approval the appropriate judgment to be entered in this case.