Milford R. Baumgardner v. Commissioner. Pearl E. Baumgardner v. Commissioner. Milford R. Baumgardner and Pearl E. Baumgardner v. Commissioner.
Baumgardner v. Commissioner
Docket Nos. 49897-49899.
United States Tax Court
T.C. Memo 1956-112; 1956 Tax Ct. Memo LEXIS 182; 15 T.C.M. (CCH) 559; T.C.M. (RIA) 56112; May 9, 1956
George Bouchard, Esq., 900 Wilshire Boulevard, Los Angeles, Calif., for the petitioners. Thomas J. Sullivan, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies in income tax and additions to tax: Against petitioners Milford R. Baumgardner and Pearl E. Baumgardner, husband and wife: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
293(b)
294(d)(1)(A)
294(d)(2)
1942
$ 647.54
$ 323.77
None
None
1944
886.93
443.47
None
None
1946
1,994.90
997.45
$225.52
$135.32
1948
3,837.82
1,918.91
448.12
268.87
1949
326.88
163.44
None
78.22
1950
5,426.42
2,713.21
557.80
334.68
1951
1,379.12
689.56
168.80
101.29
Against petitioner Milford R. Baumgardner: 1945
$1,146.97
$ 573.49
$ 73.38
1947
685.19
342.59
41.50
Against petitioner Pearl E. Baumgardner: 1945
$1,146.97
$ 573.49
$ 73.38
1947
685.19
342.59
41.50
*183 In an amended answer the Commissioner claims increased deficiencies for the year 1947, both in dockets 49897 and 49898, as follows: Additions to Tax
Sec.
Sec.
Tax
293(b)
294(d)(1)(A)
$1,926.68
$963.34
$115.98
The questions involved are whether petitioners reported all of their income for the years in question; whether the additional assessments for the years in question, with the exception of 1950 and 1951, are barred by section 275 of the Internal Revenue Code of 1939; whether any part of the deficiencies was due to fraud; and whether the additions to tax for failure to file declarations of estimated tax and for substantial underestimate of estimated tax were properly made. This latter issue was raised by the pleadings, but no evidence was introduced other than evidence disputing the deficiencies upon which the additions to tax were based. Findings of Fact The stipulated facts are so found and the stipulation and the exhibits referred to therein are incorporated by reference. During the taxable years petitioners were husband and wife. They resided in the City of Hawthorne, California. For the years 1942, 1943, 1944 and 1946 Milford (hereafter *184 sometimes referred to as petitioner) filed separate returns in which he claimed his wife as an exemption. For 1945 and 1947 petitioner and Pearl filed separate returns on a community property basis. For 1948 to 1951, inclusive, joint returns were filed. All returns were filed with the collector of internal revenue for the sixth district of California. Petitioner was born in 1903. He came to California from Oklahoma in 1924. In Oklahoma he had been variously employed by a transfer company, a grocery firm, and as a motion picture operator. After coming to California he worked as a dishwasher in a restaurant and in a pool hall. He was also employed in the Hawthorne fire department at a small salary. He and Pearl were married in 1927 and in that year he became a member of the Hawthorne police force. He remained on the force, except for a few short periods, until his retirement in 1953. He was Chief of Police for the City of Hawthorne from 1937 until his retirement. After her marriage, Pearl remained at home as a housewife and had no income except from the operation of a dress shop from March 1948 to May 1950. For the years 1925 to 1951, inclusive, petitioner earned the following income *185 from the City of Hawthorne: 1925
$ 45.00
1926
1,770.00
1927
1,800.00
1928
1,840.00
1929
1,920.00
1930
1,443.36
1931
2,068.06
1932
1,561.84
1933
0
1934
$1,025.50
1935
1,570.00
1936
1,609.24
1937
1,768.02
1938
2,236.69
1939
$2,220.00
1940
2,280.00
1941
2,284.20
1942
2,400.84
1943
2,775.09
1944
2,820.07
1945
3,066.99
1946
3,106.17
1947
3,911.83
1948
4,213.76
1949
4,507.21
1950
3,485.80
1951
6,061.70
Petitioners filed no federal income tax returns for the years 1930 to 1939, inclusive. For the years 1940 and 1941 petitioner filed returns showing no tax. Pearl filed no returns. Prior to 1942 petitioners had never paid an income tax. In June of 1937 petitioner applied to the Bank of America for a loan of $200 to pay off another obligation with the Bank which then had a balance of $65.98 and to take care of funeral expenses of $140. This loan was rejected. On the loan application, which was signed by the petitioner, appears the information that there was at this time $250 owing by the petitioner to Acme Loan which was being paid off in monthly installments of $32.08, $105 owing to Inglewood Furniture which was being *186 paid off in monthly installments of $5, and $70 owing to Federal Outfitting Company which was being paid off in monthly installments of $4. On this application petitioner listed no other income or no source of income other than from the Police Department, though the application specifically asked for this information. In April of 1938 petitioner applied to the Bank of America for a personal loan of $200 for the purpose of taking a vacation trip to Oklahoma. On the loan application, which was signed by the petitioner, appears the information that petitioner owed $40 to the Marbro Department Store which was being paid off in $5 monthly installments and also owed $40 to the Inglewood Furniture Company which was being paid off in monthly installments of $5. On this application petitioner listed no other income or source of income other than from the Police Department, though the loan application specifically asked for such information. In January of 1939 petitioner negotiated a loan of $480.30 from the Bank of America to refinance a used 1938 Chevrolet and contracted to make payments of $32.02 per month. On the purchase statement signed by petitioner he listed as income only a salary *187 of $185 per month and listed nothing under other income or source of other income. In an application for a loan on property in 1941 signed by both petitioners their annual income is stated to be $2,400. An analysis of the records of the Bank of America where petitioners carried amounts made by a special agent engaged in the investigation leading up to the deficiencies herein, showed little activity, no large balances and no large deposits or withdrawals during the years 1940 to 1944, inclusive. In 1946 petitioner purchased for Jim Bruno a one-half interest in the Beacon Cafe. Petitioner put up the money for this transaction but was reimbursed by Bruno. The following year the other half interest was also purchased for Bruno. Petitioner had no interest in the cafe. By gift from another partner petitioner became the owner of a 5 per cent limited partnership interest in a poker club, called the Embassy Club, in the City of Hawthorne in 1951. On December 31, 1951, there was a balance of $673.06 in petitioner's capital account in the club. Petitioner kept no records of real estate transactions, the poker club, rentals, interest, dividends or "commissions", the latter being reported *188 on returns for 1947, 1948, and 1949 in rounded amounts of $2,000, $3,000, and $6,000, respectively. Petitioners received interest income during the taxable years from savings accounts, trust deeds and a note in the following amounts: 1944
$ 115.03
1945
768.77
1946
1,093.39
1947
929.74
1948
$904.09
1949
705.11
1950
626.18
1951
530.53 Most of this interest was collected by a bank and credited to the petitioners' account. It was not reported on the tax returns. During 1949 petitioners received $1,550 in rentals. Of this sum $1,250 was paid by the tenant to a bank and credited on petitioners' account. The remainder was paid to petitioner by check. These amounts were not reported on the tax return for 1949. Petitioners received dividend income in the years 1943 to 1948, inclusive, and in 1951 in amounts ranging from $12.50 to $50 which were unreported on the tax returns for those years. Petitioner was entitled to a distributable share in the amount of $1,126.81 in 1951 from the poker club in which he was a limited partner. He did not report this amount on his tax return. Petitioners sold two properties in 1944 reporting a gain on their income tax *189 return of $430 on one piece and $780 on the other. These sales actually resulted in gains of $4,527.28 and $2,136.26, respectively. In 1945 another piece of property was sold on which there was a reported gain of $2,257. The actual gain was $5,359.05. In determining the deficiencies herein the Commissioner used a schedule of petitioners' assets and liabilities from which their net worth was computed as follows: 12/31/40
$ 9,358.67
12/31/41
10,367.85
12/31/42
14,273.76
12/31/43
15,219.48
12/31/44
21,679.44
12/31/45
34,434.66
12/31/46
$43,129.80
12/31/47
51,283.18
12/31/48
67,375.44
12/31/49
70,597.12
12/31/50
91,345.31
12/31/51
98,123.27
This schedule contained an item "Investment - Beacon Cafe" which was carried for the year ended December 31, 1946 at $13,547.26 and for each of the following years through December 31, 1951 at $16,842.26. Petitioner had no investment in the Beacon Cafe in those years. It also carried an item of $100 "Cash on hand" in each of the years in question. Petitioners had cash on hand of $5,000 for each of the years ended December 31, 1940 through December 31, 1944 and $3,000 for each of the years ended December 31, 1945 through *190 December 31, 1951. The schedule also carried an item in the year ended December 31, 1951 of $673.06 entitled "Embassy Club". This item represents petitioner's balance in his capital account in the club. The above three items affecting net worth are the only disputed items in the net worth schedule. In other respects the schedule of assets and liabilities (Exhibit 1-A included herein by reference) is found to be true and accurate, as is the schedule of living expenses (Exhibit 2-B, also included herein by reference). Our findings above with respect to the disputed items appearing on the schedule of assets and liabilities will be given effect in a rule 50 computation. Statutory notices of deficiency were mailed to petitioners on May 11, 1953. The returns for each of the years in which there is a deficiency, except those for the years 1945 and 1947 filed by Pearl, were false or fraudulent with intent to evade tax and part of the deficiency in each of such years was due to fraud with intent to evade tax. Opinion TIETJENS, Judge: The Commissioner determined the tax liability of petitioners for the years in question by the net worth method for all years except 1944 and 1949. *191 For the latter years the deficiencies were determined on the basis of specific items of unreported income. So determined, petitioners' taxable income exceeded their reported income as follows: Net Worth
Specific
Year
Method
Item
1942
$ 3,190.26
1943
1944
2,160.41
$3,674.01
1945
8,804.76
1946
7,535.12
1947
15,042.74
1948
12,231.15
1949
1,529.86
1,428.66
1950
20,837.46
1951
5,938.12
The assessment of taxes for all of the years, except 1950 and 1951, is barred by the statute of limitations unless the returns were fraudulent with intent to evade tax. Whether this was so is a question of fact with the burden on the Commissioner to prove fraud by clear and convincing evidence. This burden, we think, has been carried with respect to all returns, except those of Pearl filed for the years 1945 and 1947. Assessments against her for those years are therefore barred. Computations were introduced in evidence by stipulation showing petitioners' net worth as ascertained by the Commissioner's investigation at the end of 1940 and each of the years before us. Petitioners concede that these computations are substantially correct but complain in three *192 respects with reference to the schedule of assets, namely (1) cash on hand, (2) investment in the Beacon Cafe, and (3) the item of $673.06, "Embassy Club" in 1951. Petitioners also objected to several items in the schedule of living expenses which entered into the net worth computation but no evidence was introduced bearing on these items. The disputed items will be commented on separately. Cash on Hand The Commissioner determined that petitioners had $100 cash on hand at the beginning and end of each of the taxable years. Petitioner testified, however, that he had accumulated $2,000 to $3,000 in cash when he came to Oklahoma and that by 1939 he had made $15,000 to $16,000 as profit by dealing in defaulted bearer bonds of the City of Hawthorne. We are willing to believe that petitioner did invest in these bonds which at times sold for as little as ten to fourteen cents on the dollar. His testimony in this respect is corroborated by the witness Travers who was in charge of the municipal bond department of a Los Angeles investment firm which dealt in the Hawthorne bonds. Travers testified in a general way that petitioner bought bonds in an amount ranging from $15,000 to $35,000 *193 par value. He in no way, however, testified as to the price paid by petitioner for the bonds or that he knew of any profit made by petitioner as a result of his purchases or sales. There is no evidence as to how long petitioner kept his bonds, or as to their maturity dates and he was vague as to whether he had held them to maturity or whether they were sold and the price for which they were sold. The investment house records which would have shown purchases by petitioner from Travers had he made them did not show any such transactions. We cannot accept this testimony as establishing that petitioner accumulated cash in anywhere near the amount claimed as profits. His income tax returns reported no such profit. His borrowing from banks in the period just before 1942 in small amounts tends to show no such accumulation of cash by the date of the opening net worth computation and we do not believe petitioner's claim that he kept a large cash hoard hidden at times under the corners of rugs in his house and at other times carried it in a money belt. We do believe, however, that petitioner had a substantially larger sum of cash during the years involved than the Commissioner's computation *194 shows and after careful consideration of all the evidence on this point we have found as a fact that petitioner did have cash in the amount of $5,000 on December 31, 1940 and at the end of each of the years 1941, 1942, 1943, and 1944, and that at the end of each of the taxable years thereafter, he had cash in the amount of $3,000. The net worth computations should be adjusted to reflect these findings. Beacon Cafe As to this asset the Commissioner contends that petitioner was a silent partner owning 50 per cent of the Beacon Cafe from January 10, 1947 to March 3, 1948 and that thereafter he became sole owner by the purchase of the other half interest. Petitioner testified that he had entered into the cafe transaction as a "front" for Jim Bruno and that he had been reimbursed by Bruno for the cash used in the purchase. Bruno had died before the hearing of the case and we have no testimony from him. The evidence with regard to the purchase of the cafe and of petitioner's part in it is indeed confusing. Petitioner's testimony, however, is corroborated in some respects by other witnesses. After carefully weighing all the evidence bearing on the purchase and ownership of the cafe we *195 have found as a fact that petitioner had no interest in the Beacon Cafe. Accordingly, it should be eliminated as an asset of petitioner's in the net worth computation. Embassy Club Petitioner contends this item of $673.06 appearing in the year ended December 31, 1951 should not be treated as an asset in that year. However, the evidence is convincing that petitioner was the owner of a 5 per cent limited partnership interest in the Embassy Club in the year 1951 and that the item of $673.06 remained on the partnership books at the end of the year to the credit of petitioner's capital account. We perceive no reason for not treating the amount as an asset of petitioner's at the end of 1951. The foregoing adjustments can be given effect in a rule 50 computation. Except for the year 1946 it is apparent they will not materially affect the deficiencies as determined. With these adjustments we find the net worth computations as reliable as net worth computations ever can be. The fact that several items therein have been attacked by petitioner and that to some extent we have found the attack to be meritorious would not justify us in disregarding the computations in their entirety. Fraud
*196 On the fraud issue, we are faced with under-reporting of income in substantial amounts over a number of years. While fraud is never presumed and the mere understatement of income alone may be insufficient evidence of fraud, yet consideration of the record as a whole convinces us that the returns here involved, with the exception of those filed by Pearl, were fraudulent with intent to evade tax and that part of the deficiencies in each year were due to fraud. Our conclusion in this respect is based, among other things, on our observation of the witnesses, our appraisal of their credibility, the demonstrated increase in net worth over the years without satisfactory explanation of failure to report actual income, the conceded failure to report true gains on real estate transactions in at least two of the taxable years, as well as the nonreporting of dividends, rentals, and interest. Adding up all the facts and the inferences to be drawn from them, we think the Commissioner has met his burden of proving fraud by clear and convincing evidence. In reaching this conclusion we have not been influenced by the testimony of two witnesses to the effect that they paid so-called "protection" *197 money to enable them to operate a house of prostitution free from police interference in Hawthorne. While the story told by these witnesses is some indication that "protection" payments were made in the City of Hawthorne, the record contains no convincing evidence tracing the payments testified about to petitioner. No evidence was adduced with respect to the additions to tax pursuant to sections 294(d)(1)(A) and 294(d)(2) and the Commissioner's determination in this respect is sustained. Also, for the years 1944 and 1949 where the deficiencies were not based on net worth, the record supports the Commissioner and his determination is approved. As indicated above, a rule 50 computation giving effect to the adjustments in net worth set out in this opinion may result in there being no deficiency in one or more of the taxable years. In that event the addition to tax for fraud will be eliminated as a matter of course. Decisions will be entered under Rule 50.