Josef C. PATCHEN and Aleyne E.
Patchen et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 16981.

United States Court of Appeals
Fifth Circuit.

July 23, 1958.

Randolph W. Thrower, Atlanta, Ga.,
Sutherland, Asbill & Brennan, Atlanta,
Ga., of counsel, for petitioners.

Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Frederick B. Ugast, A. F. Prescott, Attys., Dept. of Justice, Nelson P. Rose, Chief Counsel, Internal Revenue Service, John M. Morawski, Sp. Atty., Washington, D. C., for respondent.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

 Presented by this appeal from a decision of the Tax Court adverse to all members (and their wives) of a professional consulting engineering partnership is the question whether the Commissioner could require computation of distributable partnership income for the years 1948–1951 on the accrual rather than cash basis as used in all returns since 1946. Additionally, in the case of one such partner, there is the further question whether penalties for failure to file a declaration of estimated tax, Section 294(d) (1) (A), 26 U.S.C.A., and for substantial underestimate of the tax, Section 294(d) (2), can both be imposed in the same taxable year.

I.

Taxpayers in 1946 organized a partnership for performance of professional engineering services. The partnership maintains no inventories and its activities are confined to the practice of professional engineering. This covers a wide field including the design and engineering-construction supervision for large projects, governmental and industrial, such as airports, sewerage systems, chemical plants and the like. As business developed, the fee arrangements fell into four main classifications: (1) lump sum fee, (2) hourly rate for work performed, (3) cost-plus lump sum, and (4) percentage of cost of construction.

At the outset, the books and records for 1946 and 1947 were essentially the cash receipts and disbursements method of accounting. The Cash method was definitely used in the first and all subsequent income tax returns. Presumably because of complications in the diverse types of billings[1] to clients under the four classifications for fees, these "bookkeeping records * * * were limited and incomplete" in the sense that the partnership accountants, in compiling the necessary information for Income Tax Returns for 1946 and 1947 " * * * had to make a complete analysis of every transaction * * *." There is no showing or finding, however, that the partnership's Cash method books did not clearly reflect its income or that extraneous materials were essential or that extraneous adjustments were made.

In 1948 the partnership directed its Certified Public Accountants to install a method of bookkeeping showing the cost of each job done by the partnership for use in billing under the various fee arrangements. This new system was essentially an Accrual method of accounting. However, the new system included[2]

---

1. The Tax Court described it:

"Billing methods and practices varied with the type of contracts. Contracts for services on an hourly basis were invoiced periodically on the basis of man hours performed. Contracts predicated on a percentage of construction costs were not billed ordinarily until the plans and specifications were completed; but where the terms of the contract provided for interim billings, periodic invoices were prepared based upon a partner's evaluation of the percentage of completion. If a contract permitted the client to retain a portion of the fee until the construction of the project was finished, it was the practice of the partnership to enter these billings on its books net, i. e., after deducting the amount to be withheld by the client. In some instances, the partnership had to make adjustments in the amounts billed due to disputes with clients. These adjustments were the usual adjustments made by any business."

2. In addition to nondeductible partners' salaries, there were reserves for slack-time pay (covering salaries and wages of key personnel to maintain continuity of employment when not actually assigned to a job), vacation pay, vacation pay-partners, litigation reserves, etc.

partners' salaries and other charges to various reserves which were not deductible for Federal income tax purposes under any method of accounting. Through the use of the so-called Jobs in Progress Account and transfers from it into the Job Cost Account, the system also provided for deferring to a later year certain expenses on uncompleted jobs which, on either a Cash or Accrual method were properly deductible only in the current year.[3]

That the new system was intended to serve a limited function and was definitely not intended to supplant the Cash records or method of reporting its income tax returns, is shown by the Tax Court's findings:

"At the end of each of the years here involved, the accounting firm employed by it audited its books and determined its income according to an accrual method. On its returns for these years, the partnership continued to use the cash receipts and disbursements method. It did not, at any time, request permission from the Internal Revenue Service to change its method of accounting from the cash to an accrual method, and it did not desire to change the method used in preparing its returns. In preparing the partnership income tax returns for the years in

issue, the partnership's accountants prepared memorandum journal entries converting all elements of income and expense to the cash receipts and disbursements method. Such adjusting entries are shown in the accountants' working papers, but are not entered on the partnership's books. These working papers and memorandum journal entries were kept by the accountants as a permanent part of their records and were available and furnished to the respondent's examining officers in the course of their examination. Without such working papers, the partnership's net income on the cash method was not readily ascertainable from its records."

Recasting the last sentence of this excerpt into an affirmative form, the Tax Court holds that "with * * * such working papers, the partnership's net income on the cash method was * * * readily ascertainable from its records."

The Tax Court then proceeded to hold that since the current books regularly kept by the partnership were on an Accrual basis, it was, under Section 41 of the Code [4] " * * * entirely proper for [the Commissioner] to determine that the partnership income should have been reported on the Accrual method for the years here in issue.[5]

---

3. While no longer in controversy, the Tax Court held that the Commissioner in recomputing taxable income on the Accrual method was in error in disallowing the deduction for wages, telephone and other expenses in the Jobs in Progress Account. The Court stated: "However, the remaining items in the jobs in progress account * * * constitute expenses which are deductible in the year in which incurred, even though the partnership's clients may not have been billed for the jobs to which such expenses related until a subsequent year. There is no provision in the Code permitting the postponement, by an accrual basis taxpayer, of the deduction of expenses from one year to another in order to obtain a precise matching of income and expenses * * *."

4. "The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such methods as in the opinion of the Commissioner does clearly reflect income. * * * " 26 U.S.C.A. § 41.

5. To this statement the Tax Court then listed these cases in support of the holding: Charles D. Mifflin, 1955, 24 T.C. 973; Melvin E. Tunningley, 1954, 22 T.C. 1108; Deakman-Wells Co., 1953, 20 T.C. 610, reversed on other grounds 3 Cir.,

But no sooner had this been said, than the Tax Court saw that it was faced with the dilemma: what was to be done with the Regulations,[6] stated in mandatory terms, prohibiting a change in the method of keeping books unless done with the Commissioner's consent and on the terms imposed by him? The Court did not try to meet this by minimizing the effective force of this Regulation or denying that, under it, the Commissioner could have rejected returns [7] on an Accrual basis had they been filed.

On the contrary, the Tax Court forthrightly recognized that here was a clash between the literal requirement of *conformity* to the method of accounting regularly employed and the further requirement of *consistency* as between current return and prior returns. The solution eschewed a relative weighing of the two, or the formulation of any guide which might with some reliability be followed either by taxpayers, the Commissioner, Revenue Agents, Tax or reviewing Courts. The solution was to introduce for the first time in this field the existence of an *option* in the Commissioner:

"But the taxpayers' difficulty is of their own making and they are in no position to complain, as they do, that this result gives the [Commissioner] the *option* of accepting cash basis returns which are *consistent* with those previously filed, or of requiring that the returns be prepared on the accrual method in *conformity* with the partnership's books. If the accrual method proved to be a more accurate method for the taxpayers, then the [Commissioner] should also be entitled to the benefits of this increased accuracy. * * * It is not enough to say that either the cash method used by the partnership in its returns or the accrual method proposed by the [Commissioner] will clearly reflect income, and that *consistency* requires the continued acceptance of the partnership returns on the cash method. The requirements of section 41 are clear and must be followed. (Emphasis supplied.)

As we view the case, we need not determine whether such an option can be claimed, or its reaches if it exists. We must say, however, that in many respects the assertion of such an indefinable

---

1954, 213 F.2d 894; Bradstreet Co. of Maine, 1931, 23 B.T.A. 1093, reversed on other grounds 1 Cir., 1933, 65 F.2d 943; Louis Kamper, 1928, 14 B.T.A. 767; Ribbon Cliff Fruit Co., 1928, 12 B.T.A. 13.

6. Regulations 111, Sec. 29.41–2, "Bases of computation and changes in accounting methods * * *
"The true income, computed under the Internal Revenue Code and, if the taxpayer keeps books of account, in accordance with the method of accounting regularly employed in keeping such books (provided the method so used is properly applicable in determining the net income of the taxpayer for purposes of taxation), shall in all cases be entered on the return * * *
"A taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. * * * The application shall be accompanied by a statement specifying the classes of items differently treated under the two methods and specifying all amounts which would be duplicated or entirely omitted as a result of the proposed change. Permission to change the method of accounting will not be granted unless the taxpayer and Commissioner agree to the terms and conditions under which the change will be effected * * *."

7. The Court said: "Having initially chosen to file its returns on the cash basis, it could not require * * * [Commissioner] to accept subsequent returns prepared on an accrual basis unless it had first requested and received * * * [Commissioner's] consent to such change. Regulations 111, Section 29.41–2. This is true even though it had changed its accounting method and the method used in preparing its returns no longer coincided with that used in its books. National Airlines, Inc., 1947, 9 T.C. 159; Ross B. Hammond, Inc., 1937, 36 B.T.A. 497, affirmed 9 Cir., 1938, 97 F.2d 545; American Conservation Service Corporation, 1931, 24 B.T.A. 183."

privilege is comparable to similar efforts by the Commissioner to read into the operation of Section 41 and Reg. 29.41-1-4 the right to impose on a taxpayer whose tax is coercively recomputed by the Commissioner on an Accrual rather than the reported Cash basis because the method of keeping books has changed or the return was not consistent with the books as kept, the same terms and conditions which would have been imposed had the taxpayer sought and obtained the Commissioner's consent. Except for vacillations in the Tax Court and reviewing Courts attempting to find and then apply as a basis for distinguishing the holding pronounced by Judge Learned Hand in William Hardy, Inc., v. Commissioner, 2 Cir., 1936, 82 F.2d 249, a distinction which that eminent jurist first expatriated as 121 volumes and 17 years later he overruled the case itself, Commissioner of Internal Revenue v. Dwyer, 2 Cir., 203 F.2d 522, nearly all such efforts [8] have met with a singular lack of success. Goodrich v. Commissioner, 8 Cir., 243 F.2d 868.

The existence of any such option has far-reaching and, in some ways, disturbing implications. As an option, it recognizes that where the taxpayer has changed his method of keeping books without consent but, in compliance with the Regulations which prohibit computation of income tax returns on the new method prior to consent, has continued to use the old basis for the return, the Commissioner may nevertheless recompute the taxes as though consent had been asked and obtained and as though the tax return had been made on the new basis conforming to the new bookkeeping method. But, as an option, it also recognizes that he might not, so that the Commissioner would continue to hold the taxpayer to the prior basis for making the tax return until consent is given.

The consequences of a choice either way cannot be forecast. They can be determined only after the event. What will the guide be for its exercise? The temptations, of course, would be present to adopt whichever course produces the greater revenue. That purpose is certainly not the philosophy which Congress reflects generally in the income tax law. For those taxpayers who read, and understand, and then religiously attempt to follow the Regulations forbidding a change in computation of the income tax return until consent is given, it also subjects them to the prospect of substantial penalties for underestimating the tax as well as to interest for a number of years on any such option-determined [9] deficiencies. This latter would

8. While it is true that these cases dealt technically with the question whether in any such reconstruction of taxable income the Commissioner had to allow taxpayer to take into account opening accounts receivable and inventory the rationale of the cases reflects that the wide discretion which Section 41 gives the Commissioner to make "the computation * * * in accordance with such method as in the opinion of the Commissioner does clearly reflect the income," Wood v. Commissioner, 5 Cir., 245 F.2d 888, 891, must yet be a reasoned one. The historical development of this phase is interestingly discussed by Judge Graven in Welp v. United States, D.C.Iowa, 103 F.Supp. 551, reversed by the Court of Appeals for the 8 Cir., 207 F.2d 128, as it extricated Judge Graven from the overpowering effect of William Hardy, Inc., v. Commissioner, supra. See, also, Commissioner of Internal Revenue v.

Mnookin's Estate, 8 Cir., 184 F.2d 89; Commissioner of Internal Revenue v. Frame, 3 Cir., 195 F.2d 166; Commissioner of Internal Revenue v. Schuyler, 2 Cir., 196 F.2d 85; Commissioner of Internal Revenue v. Cohn, 2 Cir., 196 F.2d 1019; Caldwell v. Commissioner, 2 Cir., 202 F.2d 112.

9. These awesome possibilities are magnified by operation of Regulations 111, Sec. 29.41-2, note 6, supra, which defines "a change in the method of accounting" in sweeping terms which includes even innocuous minute, technical changes:

"For the purposes of this section, a change in the method of accounting employed in keeping books means any change in the accounting treatment of items of income or deductions, such as a change from cash receipts and disbursements method to the accrual method, or vice versa; a change involving

leave the taxpayer in the weird predicament of having the Commissioner determine that his tax was deficient because it ought to have been reported on a different basis even though, under the Regulations, the taxpayer had no legal right to prepare and file his return on the basis which would have avoided such liability.

If any such option exists, we think it never could be exercised until all reasonable basis has been exhausted for accommodating the principal aims of *conformity* and *consistency*. After all, they have a common objective, to assure that income and deductions are not artificially and fortuitously bunched to produce a distorted picture with unrealistic and unfair advantage or disadvantage to taxpayer or the Government alike. Goodrich v. Commissioner, 8 Cir., 243 F.2d 686, 688. We nowhere near approach that situation here.

First, we are dealing with a professional personal service enterprise in which the Cash method would be entirely adequate as a basis for computing income. As the Tax Court found "The partnership did not, at any time, hold merchandise inventories which would require the use of an accrual method in keeping its books or reporting its income." And, more important, the Tax Court expressly held that "The partnership's income could, on the facts of this case, be clearly reflected by use of either the cash or accrual methods." [10]

The partnership started out with the Cash method of bookkeeping. Its returns were in conformity with that. Returns for subsequent years were consistent with the prior returns. For its own internal purposes it installed an Accrual system. But this was to supplement, not supplant, the Cash method. An integral part of the 1948 system was the recognized necessity for accounting adjustments which were to be made by the partnership's accountants in accordance with accepted professional concepts in order that the books would show income on the Cash method so that, in turn, tax returns could be computed both in *conformity* with such books and *consistent* with prior returns.

That this system called for adjustments or that mechanical evidences of the results of them were kept in the physical possession of the partnership's regular accountants is of no significance. The first is but one of the strange consequences of a tax-weary world in which, taxwise, it is sometimes wise to spend to save, and orthodox principles have to be trimmed and hauled to meet the unique necessities of the insatiable tax-gather-

---

the basis of valuation employed in the computation of inventories (see sections 29.22(c)–1 to 29.22(c)–8, inclusive); a change from the cash or accrual method to the long-term contract method, or vice versa; a change in the long-term contract method from the percentage of completion basis to the completed contract basis, or vice versa (see section 29.-42–4); or a change involving the adoption of, or a change in the use of, any other specialized basis of computing net income such as the crop basis (see sections 29.22(a)–7 and 29.23(a)–11)."

This same apprehension is reflected in the dissent of the six judges of the Tax Court whose position was sustained by the 9th Circuit in Pacific Grape Products Co. v. Commissioner, 9 Cir., 219 F.2d 862, see especially note 10, at page 869.

10. With the possible exception of two cases (Mount Vernon Trust Co. v. Com-

missioner, 2 Cir., 75 F.2d 938, dealing with loan discounts and Advertisers Exchange, Inc., v. Commissioner, 2 Cir., 240 F.2d 958, affirming 25 T.C. 1086, dealing with multi-year advertising copy service contracts), all of the cases relied upon by Tax Court and cited and urged by the Government in support of the decision below involve businesses of a type in which, as prescribed by Regulations 111, Sec. 29.41–3 (1) * * * the production, purchase, or sale of merchandise of any kind is an income-producing factor, [so that] inventories * * * should be taken * * * and used in computing the net income of the year * * *." This brings into play the mandatory terms of Sec. 29.41–2 that " * * * in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method."

ing process. "Tax accounting is not, and is not intended to be, the same as other accounting. * * * [and] * * * a determination of 'earnings and profits' in the tax sense does not necessarily follow economic or 'corporate accounting concepts'." Hills, The Law of Accounting and Financial Statements (1957), Sec. 1.12. Guardian Investment Corp. v. Phinney, 5 Cir., 253 F.2d 326. Indeed, if making adjustments is an offense, then the Commissioner is among the first to cast stones. For in his worship of *conformity* to the ostensible Accrual bookkeeping system, he disallows, as he properly should, many of the items, see notes 2, 3, supra, which, in an economic sense, were relevant to cost of operations, the loss or profit in given jobs, but which cannot be deducted in a partnership return.

The second factor, physical possession of the adjustments by the accountants is a shallow objection. They were treated by Taxpayer, the accountants, and Revenue Agents as a part of the books *or records* of the partnership to be permanently retained for inspection by Internal Revenue officers. Regulations 111, 29.54–1. While the Tax Court did say that "Without such working papers, the partnership's net income on the cash method was not readily ascertainable from its records," this is not to be read literally either from an accounting or tax point of view. These memorandum journal entries converting all elements of income and expense to the Cash method follow accepted accounting principles. They are so simple in number, in terminology, in the number of items covered, that the stipulated adjustment entries for all four years (1948–1951) are printed in full in traditional tabular form on two pages of the appendix to Taxpayer's brief. Starting with the figure showing "Ordinary net income (loss) disclosed by books," there are ten items under "Add" and nine under "Less" resulting in the final figure "Ordinary net income as disclosed by returns." Each of these items to be added or deducted is one which any accountant in the routine conversion of

Accrual system to a Cash system would instinctively know would have to be taken into account, and each of these items is reflected by the Accrual books. Moreover, two of the adjustments entries increasing income for tax purposes, aggregating substantial sums for partners' salaries and capital reserves, see notes 2, 3, supra, are the very ones which the Revenue Agents disallowed in applying the Accrual method. There is no suggestion that to find, understand, and then intelligently deal with these items no more obvious than the others, the Agents found the Accrual system of books inadequate or that they had to search elsewhere for the numerical truth.

These books were therefore entirely adequate. They did, as the Tax Court found, clearly reflect income. Once that condition exists, Section 41 gives the Commissioner no power to reconstruct income on some other system or basis to secure more favorable tax revenue. Indeed, it is difficult to see how a conscientious taxpayer in this sort of professional activity, anxious to learn through the revealing processes of modern accountancy, more about the economic capabilities of his organization and its everyday business performance, could have done otherwise. He would know that until the Commissioner's consent was given to such a change, he could not compute and file income tax returns on the new basis. Recognizing that, conscious that if he made such an attempt, it would be a violation of the lawful regulation, hence a violation of law, the most simple and forthright solution would be to maintain the books in such a way as to serve his internal needs and, at the same time, reflect accurately the income on the former method and upon which the subsequent income tax returns would be made.

## II.

■ One Taxpayer (and his wife) failed to file any declaration of estimated tax for 1951. The Tax Court held that both an addition to tax under Sec. 294(d) (1) (A) of the 1939 Code for failure to file a declaration of estimated tax, and

an addition under Sec. 294(d) (2) of the 1939 Code for substantial underestimate of the estimated tax, may be imposed in the same taxable year.

A taxpayer is, of course, required under Section 58 of the 1939 Code, 26 U.S. C.A. § 58, to file a declaration of his estimated tax in which he states the amount estimated to be his tax for the taxable year. Under Section 59, 26 U.S. C.A. § 59, he must thereafter make quarterly payments of the estimated tax. To enforce these provisions, Sec. 294 (d) (1) (A) provides for an addition to tax for failure to file a declaration and to make quarterly payments, of five (5%) percent of each installment due but unpaid, plus one (1%) percent for each month during which an installment is unpaid, up to ten percent of the unpaid portion of the installment. Section 294(d) (2) provides for an addition to tax for substantial underestimation of the estimated tax, i. e., where the estimated tax turns out to be less than eighty (80%) percent of the correct tax liability. This latter addition consists of the lesser of six (6%) percent of the amount by which the final tax exceeds the estimated tax, or the amount by which eighty (80%) percent of the final tax exceeds the estimated tax.

Taxpayers here assert that nothing in the language of Section 294 provides for cumulative imposition of these penalties for the single omission of failing to file a timely estimate of tax, nor do the Regulations contain such a provision. The latter contention encompasses the claim that Courts upholding cumulative imposition have mistakenly relied on the Regulation[11] which, if valid, is here applied in such a way as to extend its effect far beyond the intended scope. Proceeding further with the argument Taxpayers assert that if Congress had entertained the unlikely intention of imposing a double penalty, it would have clearly said so and would have provided an entirely different statutory scheme. The only reasonable construction must therefore be that Congress intended these penalties were to be imposed in the alternative. The greater 10% penalty was designed to punish the complete failure to file a timely estimate of tax, while the lesser 6% penalty was designed to punish the filing of a substantial underestimate of tax.

So far the box score in the District Courts is in favor of Taxpayers for cases applying the double penalty concept followed in the Tax Court[12] are few[13] in number in contrast to the many which have held the penalties to be alternative[14] only. All acknowledge that up to this time while the imprimatur[15] of reviewing Courts weights the scale in the Govern-

---

11. Regulations 111, Sec. 29.294–1(b) (3) (a): "In the event of a failure to file the required declaration, the amount of the estimated tax for the purposes of [the underestimate penalty] is zero."

12. Fuller v. Commissioner, 20 T.C. 308, affirmed on other grounds 10 Cir., 213 F.2d 102; Rictor v. Commissioner, 26 T.C. 913; Acker v. Commissioner, 26 T.C. 107, 114; Maxey v. Commissioner, 26 T.C. 992, 996; Hartley v. Commissioner, 23 T.C. 353, modified 23 T.C. 564; Romer v. Commissioner, 28 T.C. 1228, 1255; Marbut v. Commissioner, 28 T.C. 687, 692; Abbott v. Commissioner, 28 T.C. 798, Id., 3 Cir., 258 F.2d 537; Olshausen, 58 T.C.M. 85. See, also, note 15, infra, listing Tax Court decisions disposed of by Courts of Appeals.

13. Peterson v. United States, D.C.Tex., 141 F.Supp. 382; Farrow v. United States, D.C.Cal., 150 F.Supp. 581; Pal-

misano v. United States, D.C.La., 159 F.Supp. 98.

14. United States v. Ridley, D.C.Ga., 120 F.Supp. 530; Owen v. United States, D.C.Neb., 134 F.Supp. 31, appeal by United States dismissed on stipulation, 8 Cir., 232 F.2d 894; Hodgkinson v. United States, D.C.Cal., 57–1 CCH USTC #9294; Jones v. Wood, D.C.Ariz., 151 F.Supp. 678; Powell v. Granquist, D.C. Or., 146 F.Supp. 308, affirmed on another issue, 9 Cir., 252 F.2d 56; Erwin v. Granquist, D.C.Or., 57–2, CCH USTC #9732; Stenzel v. United States, D.C. Cal., 150 F.Supp. 364; Barnwell v. United States, D.C.S.C., 164 F.Supp. 430; Burck v. Campbell, D.C.Ind., 58–1 USTC #9312.

15. Vogel v. Commissioner, 6 Cir., 237 F. 2d 917, affirming per curiam Tax Court decision, 14 T.C.M. 718; Baumgardner v. Commissioner, 9 Cir., 251 F.2d 311, af-

ment's favor, there has yet been no exposition[16] of the problem.

■ As we view it, the absence of affirmative language expressly stating that these additions to tax are to be cumulative is of slight importance. Equally lacking is language stating that they are to be alternative only. While the penalty nature of these additions leads us to apply the statute strictly, Stephan v. Commissioner, 5 Cir., 197 F.2d 712, 714, the words used plainly state the consequence for each of the three separate kinds of default. There were three categories of defaulting taxpayers whom Congress plainly meant to reach: (1) those who, without reasonable excuse, failed to file any declaration of estimated tax, (2) those who, without reasonable excuse, failed to pay installments on the basis of the estimate and (3) those who failed to make an accurate estimate which would affect both (1) and (2).

Moreover there is intrinsic evidence that Congress articulately distinguished among the three. Number (3), for example, is self-executing and is applicable regardless of excusable neglect. In contrast, (1) and (2), by express provision, do not apply to taxpayers whose default is excusable. This imports that this is expected to be an additional sanction for those who, without justification, fail to file a declaration or pay. Likewise, (1) and (2) by their terms, as well as Sec. 29.294–1(b) (2) of Regulations 111 are

alternative and only one, but not both, may be applied.

There is ample basis for concluding that Congress might well have had several considerations in mind in establishing this legislative pattern. Congress might have first recognized that each type of default was of a kind to be expected and hence had to be dealt with. And, more important, it might have recognized that those whose willful non-excusable acts prevented the effective operation of the scheme of self-assessment and current payment ought to bear some additional disadvantage over the person whose arithmetic or prognostication was merely faulty.

If, as Taxpayer here urges, one who willfully failed to file any declaration whatsoever is no worse off than one who merely underestimates, all are lumped into one class without regard to the obvious differences in the quality of the acts done. To suggest as an offsetting compensation, as this argument requires, that in such a case the penalty is alternative, i. e., whichever produces the greater payment, is certainly judicial legislating: we have not only read in words that are absent, found a purpose not to make the penalties cumulative, but we will have put in a minima-maxima qualification of a kind so carefully spelled out in 294(d) (1) (A) and (B) but completely lacking in 294(d) (2).

If, as the legislative history[17] of the 1954 Code seems to indicate, cumulative

---

firming Tax Court decision, 15 T.C.M. 559; Clayton v. Commissioner, 6 Cir., 245 F.2d 238, affirming per curiam Tax Court, 15 T.C.M. 105; Clark v. Commissioner, 3 Cir., 253 F.2d 745; Kaltreider v. Commissioner, 3 Cir., 255 F.2d 833, affirming Tax Court 28 T.C. 121.

16. As this opinion was being prepared for filing, the opinion of the Sixth Circuit in Acker v. Commissioner, 258 F.2d 568, was published. It is, of course, an extended discussion setting forth most persuasively the conclusion contrary to that which, with deference to that distinguished Court, we reach.

17. H.Rep. No. 1337, 83d Cong., 2d Sess., p. 100 (3 U.S.C.Cong. & Adm.News (1954) 4017, 4127); see also S.Rep. No.

1622, 83d Cong., 2d Sess., p. 135 (3 U.S.C.Cong. & Adm.News (1954) 4621, 4769).

As a sharp reminder that the constitutional distribution of powers is a wise one, when the legislative branch reached the policy conclusion that it was unreasonable to impose penalties in the range of 15%, it did not do so through any device as simple as would be our holding that the penalties were to be alternative, not cumulative. To rip one stitch in the garment of the tax law may call for a complete retailoring. In any case, that happened in this little hem line of the 1954 Code: see, e. g., Secs. 6654, 6651 (c), 7203 of the 1954 Code (26 U.S.C.A. §§ 6654, 6651(c), 7203.

penalties were considered in the light of experience to be onerous, it was for Congress, not the Judiciary, to make the change.

The result is that the decision of the Tax Court is reversed as to Part I but affirmed as to Part II.

Reversed in part and affirmed in part.