**Clifton E. BAIRD and Violet L. Baird, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 12230.**

United States Court of Appeals
Seventh Circuit.
June 20, 1958.

Lester M. Ponder, Indianapolis, Ind., Raymond W. Gray, Jr., Indianapolis, Ind., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Joseph F. Goetten, Lee A. Jackson, Carolyn R. Just, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before SCHNACKENBERG and PARKINSON, Circuit Judges, and PLATT, District Judge.

SCHNACKENBERG, Circuit Judge.

Clifton E. Baird and Violet L. Baird, husband and wife, filed a petition for review of decisions of the Tax Court of the United States in a proceeding initi-

ated by petitions filed by them in that court. Evidence consisting of exhibits and testimony was received by the Tax Court, which entered findings of fact and filed an opinion.[1] The decisions now under attack determined income tax deficiencies for the years 1952, 1953 and 1954, in the amounts of $16,499.72, $23,086.16, and $7,434.72, respectively.

The facts as stipulated by the parties[2] and as found by the Tax Court may be summarized as follows:

Taxpayers are husband and wife residing in Salem, Indiana. They filed joint returns on a *cash* basis for the calendar years involved with the district director of Internal Revenue for the District of Indiana. They are equal partners, doing business under the name Baird Trailer Sales. The partnership has engaged since its organization in January, 1947, in the sale of new and used mobile homes, or house trailers, and to a lesser extent in new and used cars, parts and accessories, furniture, and real estate, in Salem, Indiana.

Partnership returns were filed for the fiscal years ended February 28, 1952, 1953, and 1954,[3] and an amended return for the fiscal year ended February 28, 1952. The partnership kept its books and filed its income tax returns on an *accrual method* of accounting. The partnership books reflect the following gross sales and costs of sales for the relevant years:

|  | 1952 | 1953 | 1954 |
|---|---|---|---|
| Gross sales | $1,025,943.89 | $1,337,385.64 | $1,067,144.18 |
| Cost of sales | 859,746.75 | 1,141,308.59 | 908,027.87 |

During that period, the partnership sold to either of two finance companies or a bank[4] unpaid notes, chattel mortgages and conditional sales contracts.[5] The proceeds of such sales were paid by the finance companies to the partnership, with this exception: a part was withheld by each finance company and credited to the dealer's reserve account of the partnership on the finance company's books.[6] The partnership either endorsed with recourse retail paper sold to the finance companies or guaranteed its payment. It was agreed between the partnership and the finance companies:

(a) In the event the retail paper became due and unpaid, the finance company could charge the dealer's reserve with the unpaid balance;

(b) In the event the partnership had a matured financial obligation of any nature to the finance companies,[7] the amount of such obligation could be charged to the dealer's reserve account;

(c) Repossession losses of the finance companies[7] could be charged to the dealer's reserve account;

(d) The ultimate balance in the dealer's reserve account after payment of all notes by the partnership to the finance companies[7] was to be paid to the partnership; and

(e) Each finance company could look to the balance in the dealer's reserve

1. Tax Court Memo. No. 192 (1957).

2. The stipulation included, *inter alia*, certain testimony in a prior case of Blaine and Evelyn K. Johnson, 25 T.C. 123.

3. Herein sometimes referred to as the "relevant years".

4. All sometimes referred to herein as "finance companies".

5. Herein sometimes referred to as "retail paper".

6. The part withheld by the bank was deposited in an account designated "dealer escrow account" in the name of the partnership.

7. The word "companies" appears in the stipulation from which the quoted paragraphs are taken.

account to satisfy any default by the partnership on its guaranties and obligations to the finance company, as well as any default by the makers of the notes.

The partnership was not required by any finance company to do business with it to the exclusion of any other company.

The partnership was not financially able to carry the contracts of sale or the floor plan and carry the inventory of trailers held for sale, but relied upon the finance companies. For its own convenience, it procured and used in its sales legal forms furnished by the finance companies.

The account on each finance company's books designated "dealer's reserve" for the partnership was reflected as a liability of the finance company and the annual balances in such account were not reflected in its income.

During the relevant years, the partnership (by way of illustration) recorded the sale of a trailer and the sale of the retail paper on its books and records as follows:

```
Sales Receipt Journal Entry
    Cash and/or Trade-In
        Allowance                 $1,745.00
    Contracts Receivable-Finance
        Company                    3,800.00
    Trailer Sales                             $5,545.00
```

When the finance company remitted to the partnership, the following entry was made:

```
    Reserve-Finance Company       $  190.00
    Cash                           3,632.67
    Expense for Intangible Stamps      1.38
    Contracts Receivable                      $3,800.00
    Expenses (Credit Check)                       24.05

    Cost of Sales                             $3,824.05

    Cost of Sales                 $3,824.05
    Credit Inventory                          $3,824.05
```

When a purchaser defaulted on his contract and note, the trailer was repossessed upon receipt of notice of default. The partnership always paid the finance company the unpaid balance due on such note and recorded such payment on its books and tax returns as a purchase. Where defaults occurred on the notes payable to the partnership, the payments made to the finance companies as a result of the defaults were included on the partnership's returns for the relevant years as a part of cost of goods sold. On resale of the repossessed trailer, the receipts therefrom were reported as gross receipts.[8]

8. For example, if a trailer costing $5,545 with notes payable outstanding of $3,500 was repossessed and the trailer's fair market value was only $3,000, the loss, if any, was reflected on the partnership's books and records as part of cost of goods as follows: The bookkeeper of the partnership either on the date of repossession or at the close of the fiscal year charged $500 to overallowance on trailers and recorded the purchase price of the trailer in cost of used trailers at

The following table shows the amounts credited on the books of said finance companies in the dealer reserve accounts of the partnership and the amounts it received from those and other finance companies in the years indicated:

| Fiscal year ended February 28 | Credited by said finance companies in dealer reserve accounts of partnership | Received by partnership from all finance companies |
|---|---|---|
| 1952 | $25,816.58 | $1,217.94 |
| 1953 | 29,560.54 | 1,778.94 |
| 1954 | 29,660.49 | 9,141.39 |

On its returns for the relevant years, the partnership deducted specific bad debts in the respective amounts of $1,203.75, $2,239.12, and $1,203.69. Such deductions included unpaid amounts due the partnership for accessories, supplies and repairs. But what is significant here is that such deductions also included advances by the partnership to meet trailer purchaser's payments which the purchaser was unable to make and after advancement a default by the purchaser occurred.

In computing the gross receipts reported in its returns for the relevant years, the partnership deducted from gross sales the total amount credited by the finance companies in each year to the partnership's account designated "dealer's reserve". However, the Commissioner included such amounts in the partnership's income. In determining the contested deficiencies, the Commissioner reduced the total amounts credited by the finance companies to the partnership dealer's reserve accounts by the amounts received by the partnership from the finance companies in the relevant years, and added the net amounts to the partnership income.

No delinquent notes were charged to the partnership's dealer's reserve accounts by any finance company during the relevant years. During these years the finance companies were in such good financial condition that they were able to pay any accounts which might have been due and payable to the partnership out of the dealer's reserves.

The Tax Court held that the amounts of the dealer's reserves withheld by the finance companies during the relevant years and credited to the partnership's account on the finance companies' books were includible in taxpayers' taxable income in the years withheld and credited.

Taxpayers argue that the amounts withheld by finance companies and credited to dealer's reserve accounts on their books are not accruable in the year of withholding because extreme contingencies rendered most uncertain the right of taxpayers to such amounts; that the agreements between the partnership and each of the finance companies se-

$3,000 (its fair market value). However, if the trailer was sold during the fiscal year in which it was repossessed, and the bookkeeper had not charged $500 to overallowance on trailers, the purchase price of the trailer was reflected in cost of used trailers at $3,500, and the sales price of $3,000 reported in gross receipts. In the event the notes payable outstanding were $3,000 or less in the above example, the purchase price of the trailer was reflected in cost of used trailers at the amount paid by the partnership on the unpaid balance of the note payable. The finance company remitted to the partnership the amount which had been credited to the account designated "dealer's reserve" with respect to such defaulted contract and note and the partnership reported such amount in taxable income for the year of receipt, except for the years 1948 and 1949, when the credit to the amounts designated "dealer's reserve" were included in taxable income.

verely restricted the right of the petitioners to the amounts withheld; that the holdback and other restrictive provisions of these agreements were dictated by the finance companies to protect themselves against losses; that the partnership was forced to acquiesce in these unfavorable terms in order to do business with the finance companies; and that the credits in the dealer's reserve accounts were not partnership assets. Finally they argue that the trailer contracts and notes were sold by the partnership solely because of its immediate needs for cash funds, since the business would have been much more profitable if the partnership had been financially able to retain such paper.

The Commissioner argues, in part, that the Tax Court correctly held that amounts withheld by finance companies, in purchasing trailer and automobile notes and contracts from the partnership, and credited to reserve accounts in its name on the finance companies' books were includible in the taxpayers' gross income for income tax purposes in the years withheld and credited. Since the partnership was on the accrual basis, the entire profit to it from the sale of trailers and automobiles was properly includible in taxpayers' gross income at the time of sale, even though some deferred payments would not be received until a subsequent period and even though there was a possibility that the purchasers would default. He concluded that the partnership's practice of accruing less than the entire sales price is inconsistent with the accrual method of accounting.

At the outset we consider what amounts to a plea for sympathy and equitable relief made by taxpayers:

"It is obvious that the high risk element in the sale of house trailers severely limited the market for trailer coach paper and gave heavy bargaining leverage to financing insti-

tutions. As a result, the finance companies have come to exercise considerable control over a dealer's business practices and frequently participate in and police a dealer's sales.

\* \* \* \* \* \*

"The general uncertainty of the partnership in its relationship with the finance companies is also illustrated by the fact that the sale of contracts and notes took place only because the partnership was in pressing need of funds. \* \* \*

"It is obvious that the partnership would have been much more profitable if it had been able to retain the notes and contracts received from the purchasers of its trailers. If it had been able to go forward in this fashion, it could have then realized not only the profit on the sale of the trailer, but the not inconsiderable amounts which flowed from the finance charges and other 'extras.' If the partnership had been able to hold its own paper and had not been required to discount it with the finance companies, it could have reaped the financial harvest which the finance companies were able to obtain.

\* \* \* \* \* \*

"The basic agreements disclose that the partnership was at the mercy of the finance companies in the arrangements which are involved in the instant cases. The contingencies on payments to the partnership were created by the finance companies for their protection, not by the partnership."

■■ While we admire the courage of those who, without sufficient capital, enter into a competitive business field, where (it is asserted) risks are high and many,[9] we are aware that such an entry

---

9. This assertion by taxpayers is refuted by the record, which shows that for the relevant years no delinquencies were charged to the dealer's reserve accounts by any finance company, and further that during said years the total deductions by the partnership for bad debts, *only a part of which were advances by the partnership to meet defaults in payment by purchasers*, amounted to only $1,203.75, $2,239.12 and $1,203.69. As hereinbefore

is voluntary and we know of no power which courts have to grant relief from the burden of income tax laws to persons who thus find themselves "at the mercy of the finance companies". Congress has power to lay and collect income taxes.[10] If the application of the income tax law to persons situated as taxpayers say they were, requires special consideration, it is for Congress to say so, not us. Our duty is to ascertain what the law is and apply it to this case.

■ We may well start with Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200, which affirmed this court, 67 F.2d 385. At page 184 of 292 U.S., at page 645 of 54 S.Ct., the Chief Justice said:

" * * * Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. When a merchandising concern makes sales, its inventory is reduced and a claim for the purchase price arises. * * * "

■ In a layman's language, an accrual method means that you report income when earned, even if not received, and deduct expenses when incurred, even if not paid, within the taxable period.

■ In the case at bar, the partnership, in a typical case, completed the transaction of the sale of a trailer at the time the down payment was made, either in cash or trade-in allowance, or both, and the purchaser executed and delivered to it notes and a chattel mortgage or conditional sales contract. The partnership thus acquired a complete enforcible right to receive the remainder of the purchase price at the times specified in the retail paper. The circumstance that the partnership was or was not financially able to retain the paper and collect it as it became due does not preclude

the fact that its entire profit on the transaction *accrued* at that time regardless of when received. Therefore, no portion of the profit is rendered nontaxable at that time by the subsequent act of the partnership in selling the retail paper to a finance company in a transaction which left a part of the sales price of the paper temporarily retained as security by the finance company. It is significant and consistent with the law that the finance companies did not take into income the amounts credited on their books to the partnership in the dealer's reserve accounts.

Ultimately only two things could happen to the funds in the dealer's reserve accounts: either the amounts would be paid to the partnership in cash or they would be used to satisfy the partnership's other obligations to the finance companies. There is no showing that the amounts in the reserve would not be collectible from the finance companies at the appropriate time or that their collection would be improbable, for the companies were in sound financial condition and at all times able to pay out the amounts withheld in the reserves. The only thing which would prevent the partnership from receiving the full sales price would be a purchaser's default, which is not a contingency sufficient to defer the accruing of income that has already been earned. If the partnership eventually sustains such a loss, it is recognized that it would be entitled to a business deduction therefor, because it would be a debt, or portion thereof, arising from sales that had been included in income, and which was thereafter ascertained to be worthless. Actually the partnership elected, on its returns for the relevant years to use the bad debt deduction method, when it deducted for those years the amounts hereinbefore referred to. Significantly these amounts consisted, in part, of advances made by the partnership to the finance companies to meet trailer purchaser's payments which the purchaser was unable to make

---

shown, the gross sales for the same years were each well over one million dollars.

10. Amendment XVI of the Constitution of the United States.

and, after advancement, the purchaser defaulted.

■ Taxpayers do not seek to take advantage of 26 U.S.C.A. 23(k, *l*) of 1939 Internal Revenue Code, insofar as a deduction, in the computation of net income, is allowed ("in the discretion of the Commissioner") for a reasonable addition to a reserve for bad debts. This position taxpayers are forced to take because of their contention that the withheld part of the sale price did not accrue to them during the relevant years. However, quite inconsistently with their argument that the withheld amounts were not accrued income to the partnership, the latter did claim, as deductions, debts included in said accounts which defaulted within the relevant years. As the court said in Rogan v. Commercial Discount Co., 9 Cir., 149 F.2d 585,[11] at page 586:

"At all times pertinent to this inquiry, the taxpayer was operating under the reserve method for handling bad debts and did not employ the charge-off method. The statute allows these alternative methods, but having made an election as to which method it would adopt, it could not change to the other method in the absence of the Commissioner's express permission. * * *"

It is, therefore, apparent that, although § 23(k, *l*) permits the deduction of *either*, first, specific debts which become worthless within the taxable year or, secondly, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts, the partnership chose to use the specific debt charge-off method for bad debts, and should not be allowed any deductions as a reserve for bad debts.

■ In Universal Oil Products Co. v. Campbell, 7 Cir., 181 F.2d 451, at page 470, certiorari denied 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623, rehearing denied 340 U.S. 894, 71 S.Ct. 204, 95 L.Ed. 648, we said:

"Vague possibilities that income may have to be returned, or that it may possibly be subject to diminution or off-set will not alone suffice to postpone the accrual and reporting of taxable income. * * *"

We then referred to Helvering v. Nibley-Mimnaugh Lumber Company, 63 App. D.C. 181, 70 F.2d 843, where a contract for sale of timberland was executed in 1923 and it was provided that part of the purchase price was paid in cash and the balance thereof by promissory notes secured by a mortgage. The contract further provided that taxpayer should furnish abstracts and that, for certain contingencies as to failures of title and as to there being a smaller amount of timberland than specified in the contract, there should be a reduction in the purchase price. Such reductions, if any, were to be applied against the principal of the notes. We said, 181 F.2d at page 471 of the Universal Oil case:

"* * * By reason of a shortage in the timberland, determined in 1924, it was agreed between the parties that more than $66,000 of the stated sale price should be deducted from the notes representing the balance of the purchase price. The Court held that if the taxpayer was reporting and paying taxes on an accrual basis, the facts shown were sufficient to accrue the entire purchase price in 1923, even though the agreed price was conditionally subject to abatement. The Court said that the right of the seller to have the notes paid, accrued in 1923, because it then became a fixed and unconditioned liability. It is significant that in that case there was, as here, a condition which provided for a proportionate reduction in the purchase price in the event of the happening of a certain contingency."

Our conclusions, therefore, were:

"We see from these decisions that it is not every contingency that prevents the accrual of income. The

11. Certiorari denied 326 U.S. 764, 66 S.Ct. 145, 90 L.Ed. 460.

contingency must be real and substantial. * * *

* * * * * *

" * * * We must, therefore, hold that it was the duty of plaintiff to accrue and report as a part of its 1945 income the total amount of $1,035,205, which it was to receive as its share of the consideration for the license."

To the same effect are Commissioner of Internal Revenue v. Union Pac. R. Co., 2 Cir., 86 F.2d 637, 639; Frost Lumber Industries v. Commissioner of Int. Rev., 5 Cir., 128 F.2d 693, 696; and Clark v. Woodward Construction Co., 10 Cir., 179 F.2d 176, at page 177, where the court said: "The decisive factor is the creation of an enforceable liability."

In the case at bar, each sale was a transaction solely between the purchaser and the partnership. They agreed on the terms of sale, including the selling price, the down payment, the trade-in allowance, and the terms for deferred payments. The purchaser made his down payment to the partnership and delivered his traded-in vehicle to it, together with the executed retail papers. The purchaser went his way and the partnership kept the down payment and the traded-in vehicle. It was the decision of the partnership as to which finance company it would offer the retail paper. It had complete freedom of choice in this regard and conversely each finance company was free to take or refuse the offered paper. Transfer of the paper to a finance company resulted in the partnership receiving the balance of the purchase price, minus the withheld portion, the year of taxability of which is now the subject of this litigation. When this reserve had served its purpose, the partnership would also receive what remained in that fund.

Since the partnership used the accrual method of accounting, its entire profit from the sale should be reported when it accrued, regardless of when received.

Taxpayers contend that the partnership's "right to the amounts withheld from the purchase price of notes was so contingent during the taxable period that such amounts should not be accrued as taxable income in the years withheld by the finance companies." While it is possible that the partnership would not receive all of the amounts in cash, the parts withheld would in all events be used for the benefit of the partnership to satisfy its future obligations, if any, to the finance companies. Taxpayers confuse the arrangement with respect to *payment* of the sums in the reserve accounts with the vesting in the partnership in the relevant years of a fixed right to receive in due course definite sums which had become accruable to it at the times of sale in the relevant years. There is no uncertainty with respect to the amounts accrued during the relevant years. These amounts were definitely fixed at the time the funds were placed to the partnership's credit in the dealer's reserve accounts. Moreover, there is no showing that the amounts in the reserve accounts would not be collectible at the appropriate time or that collection would be improbable, as we have pointed out, *ante* 5. In the light of the record, it cannot logically be argued that the reserve would never be realized by the partnership.

■ In its reply brief, the partnership, for the first time, argues that it could have obtained the benefits of reporting its income under the installment method, if it had been financially able to hold the retail paper instead of selling it to finance companies. Evidently referring to 26 U.S.C.A. § 44(a), it argues that an accrual basis taxpayer is entitled to report his installment sale profit in the taxable years that payments are actually received. However, there is no showing by taxpayers that the partnership purported, in making its returns of income, to rely on § 44(a). Apparently the argument comes as an afterthought. It is not convincing.

Taxpayers have also called our attention to Johnson v. Commissioner, 4 Cir., 233 F.2d 952, Texas Trailercoach, Inc. v. Commissioner, 5 Cir., 251 F.2d 395, and Glover v. Commissioner, 8 Cir., 253 F.2d

735. Even if we ignore some of the facts involved in these cases which are different from those involved in the case at bar, we adhere to the views herein expressed.

We affirm the decisions of the Tax Court.

Affirmed.