John R. HANSEN and Shirley G. Hansen, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15821.

United States Court of Appeals
Ninth Circuit.

Aug. 4, 1958.

Certiorari Granted Nov. 10, 1958.

See 79 S.Ct. 121.

Emmett E. McInnis, Jr., Seattle, Wash., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Joseph F. Goetten, Carolyn R. Just, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., for respondent.

Little, LeSourd, Palmer, Scott & Slemmons, Brockman Adams, F. A. LeSourd, Woolvin Patten, Seattle, Wash., amici curiae.

Before POPE, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

Taxpayers, husband and wife, have petitioned for review of a memorandum decision of the Tax Court sustaining deficiencies in income taxes for the years 1951, 1952, and 1953 and imposing penalties for failure to file estimated returns and for substantial underestimation of taxes for those years.

John R. Hansen (hereinafter referred to as petitioner) was, in the years in question, engaged in the business of selling new automobiles. It is stipulated that all such sales were financed by the General Motors Acceptance Corporation (GMAC). As a part of the normal course of dealing, and apparently pursuant to a GMAC "Retail Plan" referred to at the trial, GMAC paid Hansen 95% of the sales price of the car at the time of the sale and retained in a dealer reserve account the remaining 5%. GMAC also credited to that account a certain percentage of the financing charges as payments from the purchaser were received. Under this arrangement no portion of the 5% reserve account was payable to Hansen except at the complete discretion of GMAC; and release of any funds was contingent on there being in the reserve account an amount in excess of 5% of all outstanding contracts. Petitioner, an accrual basis taxpayer, returned as income in the year of sale 95% of the sales price of each automobile sold. He did not accrue and return as income the GMAC reserves in the year of sale— the year they were established. His books reflected an asset account "Due Finance Co." and a liability account "Reserve for Repossession," but these were never taken into or deducted from income. Taxpayer used a specific charge-off account for bad debts arising from the business, but no losses on GMAC reserves were charged to this account. This bad debt account was unrelated to the credit sales financed through GMAC. Petitioner reported as income the amounts paid from these accounts in the year they were released to him by GMAC.

The Commissioner determined that the finance charge attaching to each sale was an integral part of the selling price; that the right to receive from the purchaser the full amount of the contract price was fixed in the year of sale; and that the dealer's reserve was contingent for possible losses and not a proper basis for reduction of gross income. The Tax Court sustained this determination, holding that the amount credited to the dealer's reserve was accruable into income in the year credited to the reserve account. The Tax Court also sustained the penalties for failure to file an estimated return and for substantial underestimation of taxes. From these two holdings, this petition for review was prosecuted.

I. Accruability of Dealer Reserves

The problem before us is not new to the tax law, although it is apparently one of first impression in this Court. The

Tax Court has consistently held dealer reserve accounts accruable in the year established, not in the year of actual payment to the dealer.[1] With equal consistency the Courts of Appeals and the District Courts have taken the opposite view.[2] The source of taxpayer's anguish in these cases is that a tax must be paid without the funds upon which the tax is levied being available for payment of the tax. This may often be the result of accrual accounting, just as it may be the result of operation of the doctrines of realization and constructive receipt. We are not impressed with the emphasis placed on this element of the case by those courts which have resolved the problem in favor of the taxpayer. On the other hand, the government is not being deprived of revenue in the long run. There is here no tax avoidance device. The dealer reserve amounts have always been reported as income in the year received. The only difference between the taxpayer and his government, therefore, is *when*, not whether, the amounts are taxable as income.

■■ Certain principles are appropriate for review. A *cash basis taxpayer* records income upon actual or constructive receipt—and it is well to note that constructive receipt means that the taxpayer *has the present right to receive* funds which he, for his own reasons, chooses not to exercise (Treas.Reg. 118, § 39.42-2). An accrual basis taxpayer must record income, and pay tax thereon, upon *fixation* of the right to receive income, not upon its actual or constructive receipt.

"When the right to receive an amount becomes fixed, the right accrues."[3]

With these basic concepts well in mind, we move to a consideration of the transactions here involved.

■ Hansen, as an automobile dealer, financed all sales exclusively through GMAC and all sales were written up on a form conditional sales contract supplied by GMAC. This contract provided for a "Total Time Price" computed, in a vastly simplified version, by adding to the cash price of the car (cost plus profit) the finance charges required by GMAC. This total time price reduced by the purchaser's down payment results in the "Time (Deferred) Balance" which becomes due and payable at the GMAC office in whatever number of installments are determined. This contract also provides, beneath the signatures of seller and purchaser, a "Dealer's Recommendation, Assignment and Guaranty," which provides, "for value received," for an immediate assignment to GMAC of the dealer's interest in the contract.

The transaction consummated and evidenced by this contract is subject to three possible interpretations. The government urges that there are here two separate sales: first, of the car by the dealer to the purchaser, giving rise to fixation of the right to receive the "Total Time Price" and requiring that amount to be accrued in the year of sale; second, of the conditional sales contract by the dealer to GMAC, for which GMAC pays less than the fair market value, but

1. Evans Motor Co., 1957, 29 T.C. 555; Kilborn, 1957, 29 T.C. 102; Morgan, 1957, 29 T.C. 63; West Pontiac, 1957, 27 T.C. 749; Texas Trailercoach, 1956, 27 T.C. 575; Brodsky, 1956, 27 T.C. 216; Blaine Johnson, 1955, 25 T.C. 123; Shoemaker-Nash, 1940, 41 B.T.A. 417.

2. Glover v. Comm'r, 8 Cir., 1958, 253 F.2d 735; West Pontiac v. Comm'r, 5 Cir., 1958, 257 F.2d 810; Texas Trailercoach v. Comm'r, 5 Cir., 1958, 251 F.2d 395, reversing 27 T.C. 575; Johnson v. Comm'r, 4 Cir., 1956, 233 F.2d 952; Modern Olds v. United States, D.C.N.D. Tex.1957; Hines Pontiac v. United

States, D.C.N.D.Tex.1957; Massey Motors v. United States, D.C.S.D.Fla.1957, 156 F.Supp. 516; Marine Chevrolet Co., Inc., v. United States, D.C.1958, 161 F. Supp. 62. The issue is pending in this Circuit in Morgan v. Comm'r, No. 15898; in the sixth circuit in Schaeffer v. Comm'r, No. 13421; cf. Keasby & Mattison v. United States, 3 Cir., 1944, 141 F.2d 163. But cf. Baird v. C.I.R., 7 Cir., 1958, 256 F.2d 918.

3. Spring City Foundry Co. v. Comm'r, 1934, 292 U.S. 182, 184, 54 S.Ct. 644, 78 L.Ed. 1200.

which can serve only as a basis for potential loss deductions not here pertinent.[4] We are in complete agreement with the Court in Texas Trailercoach v. Comm'r, 5 Cir., 1958, 251 F.2d 395, that such a view is totally unrealistic. Such an artificial characterization of the transaction ignores entirely the complete integration of the financing institution that has become the hallmark of the automobile industry. It also ignores the uncontradicted evidence in the instant case showing that all sales were in fact so financed and that no sales could have been consummated without the financial assistance of GMAC.

The transaction, we believe, is properly construed as a single three-cornered arrangement involving the dealer, the purchaser, and the finance company.[5] But even so, this does not solve the problem. The transaction may still be seen as singular, while its elements are plural. It can be reasoned that the right to the sale price is fixed at the time of the contract, thereby requiring the dealer to accrue that amount, although he has actual receipt of only 95% thereof (cf. Commissioner v. Cleveland Tr. Paving Co., 6 Cir., 1932, 62 F.2d 85.) The only amount not includable in the year of sale would then be that portion of the finance charges to which the dealer is entitled as they become fixed. (See the opinion of Black, J., in Texas Trailercoach, 1956, 27 T.C. 575, 580.) Although such an approach is entirely consistent with the principles of accrual accounting noted earlier, we are of the opinion that the peculiarities of automobile financing make this interpretation as unrealistic as that already rejected. We think Judge Wisdom ably and adequately stated the realities of this type of transaction in the Texas Trailercoach case, supra, where 251 F.2d at page 397, after expressing the general belief that "Tax incidence should reflect the realities of a business transaction," he stated:

"When we get down to what actually happens, * * * we find one transaction—a three-cornered agreement with interrelated obligations of dealer, purchaser, and finance company. Instead of being out of the first step of the transaction (the trailer sale to the purchaser), the finance company dictates the terms of the sale, has obligations running to it in the sales contract, has a fixed percentage for its finance charges worked into the sales price, and is as much a part of the substance of the business transaction as the dealer—whether or not it is the dealer who transfers the title formally to the purchaser, apparently for one hundred per cent of the purchase price. The hard core of the factual situation is that, under the three-way agreement, the dealer receives from the purchaser only a ninety-five per cent claim of right to the unpaid balance, plus a contingent claim, against the purchaser, to the remaining five per cent subject to a number of important conditions in favor of the finance company. The dealer transfers to the finance company, simultaneously, only what he receives from the purchaser. He receives from the finance company ninety-five per cent of the sales price plus a contingent claim, against the finance company, to the remaining five per cent then entirely under the dominion and control of the finance company. The dealer's claim to this five per cent may never become fixed or ascertainable; it may never be received."

At the time of the sale the only right which becomes fixed is the right to re-

---

4. To infer, as does the government, that the only question here is one of deductions "seems to shut off the inquiry at the point where we would begin and raises a question * * * that is not present in the case before us." Texas Trailercoach v. Comm'r, supra, 251 F.2d at page 397.

5. Glover v. Comm'r, supra, note 2; Texas Trailercoach v. Comm'r, supra, note 2; Johnson v. Comm'r, supra, note 2.

ceive 95% of the sale price, and not the total time price, from the purchaser through GMAC. The amount credited to the dealer's reserve is completely controlled by GMAC. It is true an amount is fixed, but this amount is subject to unilateral depletion by GMAC to off-set repossession losses, prepayment refunds, and other charges determined by GMAC; the possibility of payment under this circumstance, although the maximum amount is determined, is so remote and contingent that it cannot be said to have become fixed and ascertained (cf. Long Poultry Farms v. Comm'r, 4 Cir., 1957, 249 F.2d 726, acquiesced in by the Commissioner, Rev. Rul. 57-358, 27 T.C. 985).

We have no quarrel with the theory of the Tax Court's position. Had the petitioner financed these sales himself, or elected to sell the contract as a separate transaction, the result reached below would be correct. The dealer's recourse in those situations necessarily would be limited to the reserve for loss deductions allowed under 26 U.S.C. § 166 (formerly 26 U.S.C. § 23(k) (1)), or the installment sale provisions of 26 U.S.C. § 453(a) (formerly 26 U.S.C. § 44(a)). But that is not the factual case here presented. Petitioner had no such choices available to him. He was limited to a contract whereby he would

finance through GMAC and receive only 95% of the sale price, or he had no contract at all. This being so, the portion actually paid to GMAC but earmarked for petitioner was not an amount to which his right of receipt became fixed. It became fixed only when GMAC decided it should pay out some of the funds held in the dealer's reserve.

Section 41 of the Internal Revenue Code of 1939 (now 26 U.S.C. § 446) requires net income to be determined in accordance with the taxpayer's method of accounting or by the Commissioner in accordance with such methods as clearly reflect the income for the accounting period. A realistic view of the transactions of this petitioner confirms our conclusion that the Tax Court's reallocation of income in accordance with the commissioner's assessment must be reversed in order to clearly reflect taxable income for the years in question.

## II. Penalties

Petitioner admits that he filed no estimated returns during these years and the court below found that his failure was not due to reasonable cause. This finding is not disputed. The applicable provisions of the Internal Revenue Code of 1939 are § 294(d) (1) (A),[6] which provides a maximum 10% penalty for failure to file a declaration of estimated tax; and § 294(d) (2),[7] which

6. "§ 294(d) Estimated tax

"(1) Failure to file declaration or pay installment of estimated tax

"(A) Failure to file declarations. In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment.

For the purposes of this subparagraph the amount and due date of each installment shall be the same as if a declaration had been filed within the time prescribed showing an estimated tax equal to the correct tax reduced by the credits under sections 32 and 35."

7. "§ 294(d) (2) Substantial underestimate of estimated tax. If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a), or 66⅔ per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax so in-

provides a maximum 6% penalty for substantial underestimation of tax.[8]

Taxpayer argues that a logical interpretation of these sections precludes assessment of both penalties where there has been a failure to file the estimated return. His argument is that there can be no underestimate where there has been no estimate at all; and since every failure to file necessarily would be a substantial underestimation, the greater must include the lesser. This position has support in a number of cases following the decision in United States v. Ridley, N.D.D.C.Ga.1954, 120 F.Supp. 530.[9] The Courts of Appeals for the Fifth Circuit (Patchen v. C.I.R., 1958, 258 F.2d 544), and the Third Circuit (Abbott v. C.I.R., 1958, 258 F.2d 537), and the Tax Court, however, have taken the position that these provisions are independently applicable (see, e. g., Fuller, 1953, 20 T.C. 308, affirmed on other grounds, 10 Cir., 1954, 213 F.2d 102), and other

District Courts have similarly decided: Palmisano v. United States, E.D.La.1958, 159 F.Supp. 98; Farrow v. United States, S.D.Cal.1957, 150 F.Supp. 581; Erwin v. Granquist, D.Or.1957, affirmed on other grounds 9 Cir., 1958, 253 F.2d 26, certiorari denied 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067.[10]

Were we compelled to base our decision on logic alone, we are by no means convinced that it is not as logical to read the two code sections as imposing cumulative penalties as one. However, Congress has on two occasions expressed its intention that both these penalty provisions are applicable to a taxpayer who has failed to file a declaration of estimated tax. The Senate and conference reports on the original bill containing these provisions (57 Stat. 126, 26 U.S.C. § 1621) contain the following language:

"In the event of a failure to file a declaration where one is due, the

creased, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter (excluding, in case the taxable year begins in 1943, any quarter beginning prior to July 1, 1943) of such year (or in the case of farmers exercising an election under section 60(a), within the last quarter) in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year (or in the case of any such farmer, or in case the fifteenth day of the third month of the taxable year occurs after July 1, on July 1 of the taxable year) but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * * 53 Stat. 88, as amended June 9, 1943, 7 p. m., E.W.T., c. 120, § 5(b), 57 Stat. 144; Feb. 25, 1944, 12:49 p. m., E.W.T., c. 63, Title I, § 118(a), 58 Stat. 37; May 29, 1944, 7 p. m., E.W.T., c. 210, Part I, §§ 6(b), (8), 13(b), 58 Stat. 235, 244."

8. A third penalty, for failure to pay the estimated tax, was provided by § 294(d) (1) (B), but was specifically applicable only where a declaration had been filed. These three penalty provisions have now been consolidated into one 6% penalty for underpayment of estimated tax. Int. Rev.Code of 1954, § 6654, 26 U.S.C. § 6654.

9. Accord, Acker v. C.I.R., 6 Cir., 1958, 258 F.2d 568; Barnwell v. United States, D.C.E.D.S.C.1958, 164 F.Supp. 430; Jones v. Wood, D.C.D.Ariz.1957, 151 F. Supp. 678; Stenzel v. United States, N.D.Cal.1957, 150 F.Supp. 634; Powell v. Granquist, D.C.D.Or.1956, 146 F.Supp. 308, affirmed on other grounds 9 Cir., 1958, 252 F.2d 56; Owen v. United States, D.C.D.Neb.1955, 134 F.Supp. 31; Witt v. Tomlinson, D.C.S.D.Fla.1958, P-H Current Decisions 58–1350; Glass v. Dunn, P-H Fed.Tax.1956, para. 73,100.

10. Accord, Abbott, 1957, 28 T.C. 798, affirmed 3 Cir., 1958, 258 F.2d 537; Beacham, 1957, 28 T.C. 598, affirmed Beacham v. C.I.R., 5 Cir., 1958, 255 F.2d 103; Kaltreider, 1957, 28 T.C. 121; Patchen, 1956, 27 T.C. 592, affirmed Patchen v. C.I.R., 5 Cir., 1958, 258 F.2d 544; Acker, 1956, 26 T.C. 107, reversed Acker v. C.I.R., 1958, 6 Cir., 258 F.2d 568. Cf. Prokop v. C.I.R., 7 Cir., 1958, 254 F. 2d 544.

amount of the estimated tax for the purposes of this provision (§ 294(d)(2)) *will be zero.*"[11]

Thus it is abundantly clear that Congress was aware of the difficulty in measuring the underestimation penalty where no estimate was filed and pursuant to this understanding indicated that in the event of a failure to file, the amount of the estimated tax would be presumed to be zero. No other conclusion is possible but that Congress intended § 294(d)(2) penalties even in a situation giving rise to § 294(d)(1)(A) penalties, that is, a failure to file is also a substantial underestimation of taxes due. Subsequent amendments to these provisions changed the amounts of the penalties, but in no way altered their substantive effect.

In the 1954 revision of the Internal Revenue Code, Congress recognized the double-barreled operation of these statutes in stating:

"This charge (for underestimation) and the charge for failure to file a declaration or pay an installment of estimated tax may run concurrently and result in a combined charge of 15 (sic) percent of the estimated tax due."[12]

And the more lenient provisions of the present 26 U.S.C. § 6654 resulted. Thus at the time Congress changed the law, it recognized what the law then was.

We conclude from these expressions of congressional intent that where a taxpayer fails to file a declaration of estimated tax he was formerly, and during the years here involved, liable for the penalties imposed by § 294(d)(2) as well as for those imposed by § 294(d)(1)(A). In this respect the decision of the Tax Court is affirmed.

The judgment is affirmed as to the penalties assessed, but as to the imposition of tax on the dealer reserves the judgment is reversed and remanded for recomputation and entry of judgment in accordance with this opinion.

11. S.Rep. No. 22, 1943 Cum.Bull. 1314, 1345; Conf.Rep. No. 510, 1943 Cum.Bull. 1351, 1372. (Emphasis added.)

12. H.Rep. No. 1337, U.S.Code Congressional and Administrative News 1954, pp. 4017, 4127.