**AMERICAN COMMUNITY BUILDERS, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 13533.

United States Court of Appeals
Seventh Circuit.
March 22, 1962.

Lester Reinwald, Charles Melvoin, Chicago, Ill., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Carolyn R. Just, Lee A. Jackson, Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY and CASTLE, Circuit Judges, and MERCER, District Judge.

MERCER, District Judge.

By its judgment, the tax court determined that there is a deficiency in income tax due from petitioner to the United States in the amount of $173,960.20, for the taxable year 1953 and in the amount of $75,691.22 for the taxable year 1954.[1] The case is before us upon a petition to review that judgment.

The single legal issue presented by the petition is a question of the construction and application of remedial legislation[2] enacted by Congress to cushion the effect upon accrual-basis taxpayers of the decision in Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 463, 79 S.Ct. 1270, 3 L.Ed.2d 1360. The facts bearing upon that issue are not in conflict. In fact, the issue is a study in simplicity, but concise disposition thereof is made difficult because of its superimposition upon an unwieldy factual background.

During its taxable years, 1953 and 1954, petitioner, an Illinois corporation, was engaged in the business of developing, constructing, renting and selling residential, commercial and industrial real estate.[3] In the course of its business, petitioner developed a community which is known as Park Forest, Illinois. During the taxable years 1953 and 1954 a number of homes in Park Forest were sold by petitioner to various purchasers upon contracts for warranty deed, each of which provided for installment payment of the purchase price for the respective parcel of land involved, in ex-

[1.] Petitioner, an accrual basis taxpayer, employs a fiscal year beginning on July 1, of each year and ending on June 30, of the following year for accounting purposes and for reporting its income for tax purposes. The taxable years involved in this litigation are the fiscal years ending June 30, 1953 and June 30, 1954, respectively. For convenience, reference is sometimes made to those respective years as fiscal 1953 and fiscal 1954.

[2.] The Dealer Reserve Income Adjustment Act of 1960, 74 Stat. 124, 26 U.S.C.A. § 481 note.

[3.] Petitioner's business activities in the years in issue were carried on largely by wholly owned subsidiary corporations, including Park Forest Homes, Inc. In fact, the dealer reserve income involved in litigation was the income of and was credited to Park Forest. Since, however, each of the subsidiary corporations employed the same fiscal year for accounting and reporting of income as did the petitioner, and since a consolidated return of petitioner and all of its subsidiary corporations was filed in each of the taxable years in issue, the reference "petitioner" when used in this opinion shall mean American Community Builders, Inc., and all of its subsidiary corporations.

cess of a down payment received at the time of the transaction. In each of the taxable years in question, petitioner assigned and sold a number of the contracts for warranty deed to lending agencies. The precise arrangement under which those contracts were sold is not material. It is sufficient to relate that a part of the face amount of each was retained by the lending agency as security for the performance of the contract by the purchaser of the land, the lending agency agreeing to release the reserves thereby created to petitioner in installments geared to receipt of specified amounts upon the principal of the several contracts. Amounts so held by the lending agency as security were set up in dealer reserve accounts to the credit of petitioner. As a result of that activity, dealer reserves were accrued to the account of petitioner in the amount of $95,675.00 in fiscal 1953 and in the amount of $385,211.36 in fiscal 1954.

Petitioner employed an accrual accounting method, and reported its income for tax purposes upon an accrual basis. Petitioner omitted the amounts of such dealer reserve accounts from its reports of accrued income contained in its consolidated returns [4] for 1953 and 1954, respectively. Ultimately, the Commissioner determined that the amounts held in the reserve accounts to petitioner's credit should have been included in its accrued income for those years. A deficiency assessment, based in part upon that determination, was made. It is from that determination by the Commissioner that the present controversy arises.

A comparison of the summarized facts with the factual background of the decisions reviewed in Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 463, 79 S.Ct. 1270, 3 L.Ed.2d 1360, reveals no material distinction between this case and the cases there reviewed.[5] Affirming our decision in Baird v. Commissioner, 7 Cir., 256 F.2d 918,[6] and reversing decisions of the Courts of Appeals for the Eighth and Ninth Circuits,[7] the Court there held that amounts withheld by finance companies from the face value of installment paper purchased by them, as security for performance by the obligor on the paper of his contract, which were carried on the books of the finance company as a dealer reserve account, were reportable as income to an accrual-basis taxpayer for the year in which the paper was sold and in which the reserve was set up on the finance company's books. In reaching that decision, the Court held that the taxpayer dealer acquired a fixed right to receive the moneys retained by the finance company as reserves, either in cash payments to be subsequently made or as a credit in satisfaction of contractual obligations of the dealer to the finance company.

Thus, the legal consequences of Hansen were twofold. First, the decision resolved a conflict between decisions of the Courts of Appeals of the several Circuits. Secondly, the decision required dealers in tangible property, who employed an accrual method of accounting, and who, through the sale of negotiable installment paper, acquired dealer reserve accounts, to adopt a method of accounting which

---

4. See Note 3, supra.

5. Although the taxpayers involved in the Hansen case were dealers in either automobiles or house trailers, the same principle must apply in a proper case to real as well as personal property sales. Significant aspects of the transactions in either event are the employment of an accrual method of accounting, the fact that negotiable installment paper is taken by the dealer in a transaction for the sale of property, and the fact that such negotiable paper is sold by the dealer to a lending agency under an agreement that a part of the face value thereof will be held, for security purposes, by the lending agency in a dealer reserve account. Those significant factors being present, any factual distinctions between particular cases is of no significance.

6. Accord, Schaeffer v. Commissioner, 6 Cir., 258 F.2d 861.

7. Hansen v. Commissioner, 9 Cir., 258 F. 2d 585, and Glover v. Commissioner, 8 Cir., 253 F.2d 735. Accord, West Pontiac, Inc. v. Commissioner, 5 Cir., 257 F.2d 810; Texas Trailer Coach, Inc. v. Commissioner, 5 Cir., 251 F.2d 395; Johnson v. Commissioner, 4 Cir., 233 F.2d 952.

included such dealer reserves as income accrued in the year in which the negotiable paper was sold and to report such reserve accounts as accrued income for tax purposes in accordance with that change in their accounting method. Were it not for the intervention of remedial legislation enacted subsequent to that decision, Hansen would control the disposition of this petition.

To alleviate the possibility of harsh consequences upon a substantial number of dealer-taxpayers expected to arise from the involuntary change of accounting method which Hansen required, Congress, on May 13, 1960, enacted the Dealer Reserve Income Adjustment Act of 1960. 74 Stat. 124, 26 U.S.C.A. § 481 note. That statute, *inter alia*, granted taxpayers affected by the Hansen decision a conditional right to elect "a year of the change" of their accounting method other than the year in which the dealer reserves were actually created.

It is not disputed that petitioner is within the class of persons to whom the Act applies.[8] The only question is whether, in the light of the following chronology of events, petitioner is entitled to claim the benefits of the Act.

In July of 1958, petitioner was orally informed by a revenue agent in the Office of the District Director at Chicago that petitioner's dealer reserve income for 1953 and 1954 was in issue. Under date of September 17, 1958, the District Director mailed to petitioner a so-called 10-day letter, inviting petitioner to request an informal conference to discuss proposed adjustments, thereon listed, of petitioner's adjusted gross net income as reported in its returns for those years. Among the proposed adjustments thereon listed was the inclusion of the dealer reserve accounts in petitioner's income for

each of those years, subject, however, to a net operating loss deduction which was not thereon specified. Thereafter, on October 8, 1959, the Commissioner sent to Petitioner a statutory notice of deficiency, determining deficiencies in income tax of $374,903.24 for fiscal 1953 and of $97,086.71 for fiscal 1954. The assessed deficiencies were in part derived from the Commissioner's inclusion in petitioner's taxable income for the years in question of the amount standing to petitioner's credit in the dealer reserve accounts. The Tax Court petition followed that determination.

The Hansen decision had intervened between the 10-day letter and the statutory notice of deficiency, a fact which becomes material to the issue of this case because Congress chose the date of the Hansen decision, June 22, 1959, as a line of demarcation and a condition affecting the right of a taxpayer to cushion the effect of Hansen by electing his first taxable year after the date of Hansen as the taxable year in which such dealer reserve income would be reported.

Thus, Section 3 of the Act provides:

"(a) General Rule.—If—

"(1) for the year of the change (determined under subsection (b)), the treatment of dealer reserve income by any person to whom this Act applies is changed to a method proper under the accrual method of accounting (whether or not such person initiated the change),

"(2) such person makes an election under this subsection, and

"(3) such person does not make the election provided by section 4(a), then, for purposes of section 481 of the Internal Revenue Code of 1954, the change described in para-

8. Section 2 of the Act provides:

"This Act shall apply to any person who, for his most recent taxable year ending on or before June 22, 1959—

"(1) computed, or was required to compute, taxable income under an accrual method of accounting,

"(2) treated any dealer reserve income, which should have been taken into ac-

count (under the accrual method of accounting) for such taxable year, as accruable for a subsequent taxable year, and

"(3) before September 1, 1960, makes an election under sections 3(a) or 4(a) of this Act."

graph (1) shall be treated as a change in method of accounting not initiated by the taxpayer.

"(b) Year of Change, etc.—In applying section 481 of the Internal Revenue Code of 1954 for purposes of this section, the "year of the change" in the case of any person is—

"(1) except as provided in paragraph (2), the first taxable year ending after June 22, 1959, or

"(2) the earliest taxable year (whether the Internal Revenue Code of 1954 or the Internal Revenue Code of 1939 applies to such year) for which—

"(A) on or before June 22, 1959—

"(i) the Secretary of the Treasury or his delegate issued a notice of deficiency, or a written notice of a proposed deficiency, with respect to dealer reserve income, or

"(ii) such person filed with the Secretary or his delegate a claim for refund or credit with respect to dealer reserve income, and

"(B) the assessment of any deficiency, or the refund or credit of any overpayment, whichever is ap-

plicable, was not, on June 21, 1959, prevented by the operation of any law or rule of law. For purposes of this section, section 481 of such Code shall be treated as applying to any year of the change to which the Internal Revenue Code of 1939 applies."

Pursuant to the provisions of Section 3, petitioner, on August 30, 1960, filed a notice of election with the District Director electing to have Section 481 of the Internal Revenue Code of 1954 applied to it.[9] Pursuant to that notice of election, and treating the fiscal year ending on June 30, 1959, as its year of the change, petitioner, on November 22, 1960, filed an amended income tax return for the latter year which took into account the dealer reserve accounts which are in issue in this litigation. That election, and the fact of the filing of the amended return for fiscal 1959, were brought to the attention of the Tax Court by amendment of petitioner's pleading.

■ With that background, we reach the precise issue which is before us for decision, namely, whether the 10-day letter mailed to petitioner on September 17, 1958, constituted "a written notice of a proposed deficiency, with respect to dealer reserve income" within the meaning of

---

9. Section 481, 26 U.S.C.A. § 481, provides in part:

"(a) General Rule.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the 'year of the change')—

"(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

"(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

"(b) Limitation on tax where adjustments are substantial—

"(1) Three year allocation.—If—

"(A) the method of accounting from which the change is made was used by the taxpayer in computing his taxable income for the 2 taxable years preceding the year of the change, and

"(B) the increase in taxable income for the year of the change which results solely by reason of the adjustments required by subsection (a) (2), other than the amount of such adjustments to which paragraph (4) or (5) applies, exceeds $3,000, then the tax under this chapter attributable to such increase in taxable income shall not be greater than the aggregate increase in the taxes under this chapter (or under the corresponding provisions of prior revenue laws) which would result if one-third of such increase in taxable income were included in taxable income for the year of the change and one-third of such increase were included for each of the 2 preceding taxable years."

**12**

Section 3(b) (2) (A) (i) of the Act. The Commissioner contends that the 10-day letter was a sufficient notice of a proposed deficiency within the meaning of the Act. Petitioner disputes that contention, arguing that no statutory notice of a deficiency or written notice of a proposed deficiency was issued by the Commissioner prior to June 22, 1959. The Tax Court resolved that issue in favor of the Commissioner and entered judgment accordingly.

■ Analysis of the Tax Court's opinion reveals that its decision can stand only if it be appropriate for a judicial body to amend, by opinion, legislation duly enacted by the Congress.

In its construction of Section 3 of the Act, the Tax Court relied upon and quoted copiously from the legislative history of the Act. Particular emphasis was placed upon language of the Senate Report as follows: "[For the purpose of determining the right of a taxpayer to elect to have Section 481 apply] the notice in writing includes a 15- or 30-day letter issued under established procedure, or other similar written notification of a proposed deficiency." [10] It is clear that the Tax Court used the quoted language from the Senate Report as a spring board for interpreting "proposed deficiency" to mean "proposed adjustment" or "notification that an erroneous method of accounting was being used".

Thus the Tax Court said:

"A comparison of the letters with a view to their functional utility in the procedural plan seems to categorize the 10- and 15-day letters as methods of informing the taxpayer of his rights to an informal conference with respect to the adjustments proposed to be made."

Again, after reference to the Senate report, it said:

"* * * We think it is implicit that Congress in referring to 'other similar written notification of a pro-

posed deficiency' after designating the 15- and 30-day letters meant also to encompass a writing issued under an established procedure, which notified the taxpayer of his erroneous treatment of dealer reserve income with corresponding adjustments, which would result in a proposed deficiency in the taxpayer's income tax as reported."

The Tax Court concluded:

"[Persons subject to the Act prior to Hansen, who] had been improperly accounting for dealer reserve income but had not been 'notified in writing' that the method they were employing was incorrect were permitted to utilize as their 'year of the change' 'the first taxable year ending after June 22, 1959' * * *. Conversely, a taxpayer who qualifies under Section 2 of the Act but who was 'notified in writing' of certain adjustments to his income 'attributable to the erroneous treatment of [dealer reserve] income which proposed a deficiency prior to the Supreme Court's decision in Hansen cannot avail himself of 'the first taxable year ending after June 22, 1959' as his 'year of change.' As to this taxpayer the procedural machinery to compel a change in his method of accounting was not initiated as a consequence of the Court's ruling in Hansen, but was already in motion at the time of the Hansen decision as a result of 'an examination of his return by a revenue agent.' * * *

"We are convinced that the 10-day letter issued to petitioner was the type notification envisioned by Congress when referring to 'other similar written notification of a proposed deficiency' in the committee reports. Consistent with our view that Congress was concerned with the notification aspects, the letter informed petitioner that as a result of

10.  S.Rept. 1045, 86 Cong., 2d Sess., P. ——, 2 U.S.Code Congressional and Administrative News 1960, p. 1974. Rev.Act 1954–60, 1479, 1485, West Pub. Co. (1961).

a 'recent examination of [its] income tax liability' its method of accounting for dealer reserve income was subject to adjustment and specified the amount of adjustments. * * "

■ Resort by the Tax Court to the legislative history of the Act is plain error. Resort to legislative history has a place in judicial construction of statutes only when resort thereto is necessary to resolve a patent ambiguity in the language of the statute. E. g., Ex parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 959, 93 L.Ed. 1207; George Van Camp & Sons Co. v. American Can Company, 278 U.S. 245, 253, 49 S.Ct. 112, 73 L.Ed. 311; Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 89, 56 S.Ct. 70, 80 L.Ed. 62; Mandel Bros. Inc. v. F. T. C., 7 Cir., 254 F.2d 18, 22. As we said in the Mandel case, "when the language used in a statute is clear and unambiguous its legislative history cannot control" interpretation of the statute, because the aid of legislative history is admissible only " 'to solve doubt and not to create it.' " Quoting, Railroad Comm. of Wisconsin v. Chicago B. & Q. Co., 257 U.S. 563, 589, 42 S.Ct. 232, 66 L.Ed. 371.

■ The key word in Section 3 of the Act is "deficiency". The term "deficiency", as applied to internal revenue matters, is an amount of tax due, computed by ascertaining the difference between the amount returned by a taxpayer and the amount of tax which under the Code is due to the government. Thus, the Code has for years fixed the definition of deficiency as the amount by which the tax imposed by the Code, exceeds "the sum shown by the taxpayer upon his return", plus any amounts previously assessed or collected as a deficiency, less the amount of any rebates due to the taxpayer. 26 U.S.C.A. § 6211(a); Denton v. United States, 3 Cir., 235 F.2d 733, 734–735.

■ The Tax Court accepted the Code definition as the proper definition of the term "deficiency" in Section 3 of the Dealers Reserve Act, but concludes that there was no clearly fixed definition in the terms "proposed deficiency" as used in the same clause of that statute. Even if we ignore the fact, as we may not do, that the word "proposed" must be given its commonly understood meaning in construing the statute, we yet must translate the word "deficiency" when used in context with the word "proposed" as meaning "adjustment" or "error of method" if the decision of the Tax Court is to be sustained. Such a result is untenable in principle.

■ An analysis of the 10-day letter received by petitioner reveals that that letter may not be treated as a written notice of a proposed deficiency. That letter, the text of which is set forth in full in the margin,[11] advised the peti-

11. The text of that letter, which was signed by internal revenue agent, D. B. Diggle, omitting the heading and other formal parts is as follows:

You previously indicated that you did not agree to the adjustment(s) marked (*) listed on the reverse hereof which were proposed during a recent examination of your income tax liability.

If you Desire an Informal Conference with a representative of this office for the purpose of securing an impartial review of these adjustments, please so advise within the next Ten Days by telephoning or writing to the person whose name and address are shown below. Upon receipt of your request, a mutually convenient time and place for the conference will be arranged. You may be accompanied by any person or persons, acting solely in the capacity of witnesses, who may have knowledge of facts or can furnish information in support of the contentions on which you rely.

In the event that you desire to appear with a representative, or if you do not wish to attend the conference personally, your representative must be enrolled to practice before the Treasury Department, and a Power of Attorney in his name must be filed in duplicate with an additional conformed copy for each taxable year in excess of one, together with a contingent fee statement.

If You Do Not Request an Informal Conference within the time stated above, a report of the examination will be forwarded to you after which the prescribed procedure toward asserting the correct income tax liability will be followed.

tioner only that a "recent examination of your income tax liability" had led to a determination that adjustments were necessary in the report of income contained in petitioner's consolidated return for each of the taxable years in issue. Among other things, the letter indicated that a substantial adjustment would be made in the amount of adjusted gross net income, subject to a net operating loss deduction of some amount not shown.[12] Not only does that letter not notify petitioner that a deficiency in its tax was proposed by the Commissioner, but, also in-

Should you decide to accept the proposed adjustments at this time, it will be appreciated if you so notify this office at the address shown below.

---

(Back)

Form L-19
(5-57)
    U. S. Treasury Department—Internal Revenue Service Statement of Examining Officer's Proposed Adjustments.

| Year Ended (or period) | 6-30-53 | 6-30-54 |
|---|---|---|
| Adjusted Gross Net Income Before Net Operating Loss Deduction Shown on Return | $ 1,049,353.64 | $ (430,007.36) |
| Net Adjustments as Computed Below | 581,145.85 | 629,481.45 |
| Proposed Net Income Before N O L D | 1,630,499.49 | 199,474.09 |
| and Explanation | $ | $ |

Proposed Increase (Decrease)

| | | |
|---|---|---|
| (a) Gross profit on sale of houses, reported as unrealized must be included in income where the contracts received by the vendor (taxpayer) have a fair market value. Such fair Market value is considered to be 100%. Regulations 39.44-4 (a) & (c). Section 41, I.R.C. 1939 Revenue Ruling 55-292, 1955-1 CB-331 | 198,452.07 | 445,597.84 |
| (b) Cost of houses sold is adjusted for the cost of water mains and latterals transferred to Park Forest Water Co. | 229,202.75 | 81,671.75 |
| (c) Depreciation is adjusted with respect to item (b), above | (10,942.41) | 32.69 |
| (d) Real estate and Personal property taxes are adjusted for over and under accruals | 86,199.36) | 43,835.77 |
| (e) The documentary stamp expense pertaining to stock transfers is a capital item and must be disallowed | 632.80 | |
| (f) The amount paid to Mr. Goodman and pertaining to the financing of F.H.A. loans is not deductible. Amortization is allowed | | 58,343.40 |
| (g) Legal fee not deductible was the subject of a prior Informal Conference | 250,000.00 | |

---

12. The adjustments proposed with respect to inclusion of the dealer reserve accounts as income were set forth in the 10-day letter only as an adjustment to adjusted gross net income before net operating loss deduction. There is nothing in the letter to indicate whatever the figure the Commissioner would adopt as a net operating loss deduction, and it is therefore impossible to determine from the face of the letter whether the proposed adjustments, if made, would result in any deficiency.

The Tax Court resolved the problem by assuming that the net operating loss deduction figure shown on petitioner's tax return for the critical taxable years might be used as the figure for making that com-

formation given in the letter and in proposed adjustments listed thereon was insufficient to enable petitioner to determine whether, in fact, a deficiency would result if such adjustments were made.[13] Construed most favorable to the Commissioner's position, that letter advised petitioner only that the District Director disagreed with petitioner's method of accounting for dealer reserve income and had determined that certain adjustments were necessary in petitioner's consolidated returns for 1953 and 1954. By no stretch of the imagination can that letter be construed as a written notice of a proposed deficiency within the meaning of the statute, unless the plain language of the statute is to be amended under the guise of judicial construction.

The Tax Court, faced with the clear and unambiguous language of the statute, was not as Mr. Justice Holmes has succinctly remarked, free to inquire "what the legislature meant", but was free only to "ask what the statute means." Holmes, Collected Papers, 207.

The judgment of the Tax Court is reversed.

putation. The error of that reasoning is shown by, the fact that the net operating loss deduction claimed by petitioner for its taxable year 1953 was reduced by the Commissioner by more than $200,000.00 in his ultimate computation of petitioner's tax liability. Thus, the net operating loss deduction which the Commissioner proposed to allow was not made known to petitioner until it received the statutory notice of deficiency on October 8, 1959.

The Tax Court's reasoning could not be applied in any event without ignoring the plain mandate of Section 3 that only a written notice may, suffice to deprive a taxpayer of the benefits of election under that section. The sufficiency of a written notice relied upon by the Commissioner to deny the right of election under Section 3 must be determined from the text of the writing itself. Resort may not be had to extraneous evidence to amplify or explain the written notice.

13. Under established procedure, both the 15-day letter and the 30-day letter, to which specific reference is made in the Senate Report, are accompanied by a revenue agent's report in which the tax liability claimed by the Commissioner is determined and the proposed deficiency, if any, is set forth. Each of those letters is also accompanied by Form 870 to enable the taxpayer, if he chooses to do so, to assent to the assessment and collection of the deficiencies, as specifically set forth on the face thereof.

By contrast, the 10-day letter is mailed before the agent's report is completed and merely sets forth proposed adjustments in contention, without the reduction of such proposed adjustments to terms of tax liability or deficiency.

Even if resort to legislative history were proper in this case, it is illogical to assume that Congress envisioned the 10-day letter as a "written notification of a proposed deficiency" similar to the 15-day and 30-day letters unless we are also to assume that Congress was either incognizant of its own definition of "deficiency" or unfamiliar with the procedural practice established with respect to those letters. Neither assumption can be justified.